MRS. GOLDIE KEENER, MRS. DINK WILES, JEFFERSON WILLIAMS and MRS. SID WILES v. SAINT LOUIS WILLIAMS, MRS. BETTIE WALTERS, MACK WILLIAMS and LEWIS WILLIAMS, Appellants.

Division One, April 13, 1925.

1. **ACKNOWLEDGED DEED:** Evidence. Every deed purporting to convey real estate, if acknowledged and certified in the manner prescribed by the statutes, is admissible in evidence, without further proof, and is prima-facie evidence that it was signed by the purported grantors whose names as signers appear thereon, and makes a prima-facie case of a conveyance to the named grantee, although the purported maker stoutly denies that he ever executed it and a purported witness to his signature testifies that his signature thereon as a witness is not genuine.

2. ————: Execution and Delivery: Weight of Evidence. To warrant a finding that a deed, regular on its face and duly acknowledged and recorded, was not executed and delivered, the testimony must

Keener v. Williams.

be clear and satisfactory. And where a deed conveying the owner's land to a third party, and a deed by such third party conveying the land to such owner's wife, both regular on their face, both duly and properly acknowledged on the same day, and both forthwith recorded and have remained of record unassailed for more than thirty years, and having been recorded were returned to said owner and when received he said to his wife, "Here are the deeds," and, after being read to her, she placed them for safe-keeping in a trunk jointly used by them and there they were found after her death, it cannot be said, on appeal, that the finding of the trial court, that the said deed of the owner and his wife to said third party was executed and delivered, was against the weight of the evidence or contrary to all the evidence, although the signatures of said owner and his wife were by mark, and neither could read or write, and he stoutly denies that he signed the deed or authorized any other person to sign it for him, and testifies that he never knew that such a deed had been made, and one of the purported witnesses to his signature testifies that his purported attestation was not genuine.

3. ————: ————: **Remaining in Possession: Paying Taxes.** The fact that the husband, whose purported deed conveyed the homestead to his wife, remained in possession for many years, cultivated the soil, marketed the crops and paid the taxes on the land, assessed against him alone, is not sufficient to overthrow the prima-facie case made by the duly acknowledged and certified deed, where they lived together on the homestead and she kept the house and helped him take care of what he produced.

4. ————: **Delivery.** Where a husband and wife convey land to a third party, by a duly acknowledged deed, his immediate re-conveyance to the wife is tantamount to a delivery of their deed to him and to his acceptance of it.

5. ————: ————: **Manual Delivery: Acceptance.** To constitute a valid delivery of a deed it is not essential that manual delivery be made to the grantee himself; it is sufficient if delivery is made to another for his use, and if he thereafter re-conveys to another his acceptance of the deed will be presumed.

6. ————: ————: **Constructive.** Delivery of a deed may be constructive as well as actual; delivery is complete when the grantor has parted with dominion over it, with intent that it shall pass to the grantee, and the grantee assents thereto by accepting its benefits.

7. ————: **To Deceased Wife: Testimony of Grantor.** Where the grantor in a voluntary deed conveying land to his wife is the party attacking its validity, his testimony denying its execution and delivery is to be considered in the light of the fact that she is dead.

8. ——: **Credibility of Witness: Deference to Chancellor.** While this court may weigh the evidence in an equity suit and decide it *de novo*, it will usually defer to the finding of the trial chancellor where an issue of fact rests upon the credibility of the witnesses.

9. ——: **Consideration.** Where the deed recites a consideration of three thousand dollars, a lack of consideration cannot be shown for the purpose of defeating the operative effect of its apt words of conveyance.

10. ——: ——: **Deed to Wife.** A conveyance from husband to wife raises the presumption that it is a gift or advancement, and need not therefore be supported by a valuable consideration.

11. ——: **Conveyance to Wife: Resulting Trust.** Where a husband voluntarily conveyed his land to his wife for the purpose of avoiding the payment of unjust debts, such conveyance being made by the consent of both and long acquiesced in, to divest the title out of her heirs after her death and revest it in him, on the ground that a resulting trust arose in his favor immediately upon its execution and delivery, the evidence must be clear, cogent and convincing that the implied trust exists beyond serious doubt.

12. ——: ——: ——: **To Defraud Creditors.** A resulting trust cannot arise when the transactions out of which the supposed trust is bottomed had their origin in a fraudulent purpose. Where a husband, through an intermediary, conveys his land to his wife for the purpose of avoiding the payment of certain notes, no resulting trust in his favor arises upon a mere denunciation of the transaction out of which the notes grew as "a swindle," without any proof of the exact nature of the transaction or whether the notes had passed to innocent purchaser.

Citations to Headnotes: 1, **Evidence,** 22 C. J. 1144, 1210; 2, **Deeds,** 18 C. J. 550; 3 and 4, **Deeds,** 18 C. J. 548, 123; **Husband and Wife,** 30 C. J. 274; 5 and 6, **Deeds,** 18 C. J. 99, 123, 95; 7, **Witnesses,** 40 Cyc. 2653; 8, **Appeal and Error,** 4 C. J. 2868; 9, **Evidence,** 22 C. J. 1557; 10, **Husband and Wife,** 30 C. J. 270, 298; 11 and 12, **Trusts,** 39 Cyc. 166, 106.

Appeal from Lawrence Circuit Court.—*Hon. Charles L. Henson,* Judge.

AFFIRMED.

*H. H. Bloss, G. Purd Hays* and *A. N. Walker* for appellants.

(1) The court erred in not finding for the defendant Lewis Williams on the issue raised by the pleadings

as to the execution of the deed. While it is true that the certificate of the notary, when taken with the recording of the deed, is prima-facie evidence of the execution of the deed, this certificate and the effect of the recording are overcome by the great weight of the testimony, viz, (a) the denial by the only subscribing witness who attended the trial as to his ever having signed it or witnessed the maker's signature; (b) the aspersions cast on the character of the notary, J. J. Baker, who had to leave the country between supper and breakfast and has never since returned; (c) the continued possession of Uncle Lewis, assessment of taxes to and payment by him as well as his exercise of all the prerogatives and evidences of ownership, after the alleged execution of the deed and the alleged payment of a consideration of $3000 in cash, loaned without security; (d) that the instrument itself and the handwriting contained thereon, in the body of the instrument, show that it was not prepared by any of the alleged subscribing witnesses or the notary, for it was not that of J. J. Baker, Henry Williams, Dr. Titterington or T. W. Grammer, which suggests in no uncertain way; (e) that it must have been that of Jeff Williams who, according to the testimony of W. H. Williams, "framed" the deal and according to that of Otis Douglass, had "framed the deed—had fixed the deeds to save his father;" and by the denial of Uncle Lewis, who is shown by all the witnesses who were interrogated along that line, to have had a high sense of honor and to bear a very good reputation. These facts absolutely overcome any presumption of execution because of Notary's and Recorder's certificates. R. S. 1919, sec. 2209; Beio v. Mayes, 79 Mo. 67; Rust v. Groff, 94 Mo. 511; Burk v. Pence, 206 Mo. 315; Coming v. Leedy, 114 Mo. 454; Pierce v. Georger, 103 Mo. 544. Where it is shown that the grantor could not write, there is no presumption that he authorized some other person to sign it for him, and the party alleging it has the burden of proof. 18 C. J. 411, sec. 487; Hansen v. Owens, 132 Ga. 648; Albright v. Stevenson, 126 S. W. 1029; Marden v.

Dorthy, 42 N. Y. Supp. 827, 46 L. R. A. 694; Wannell v. Kem, 57 Mo. 478; Borand v. Walrath, 33 Iowa, 130. (2) The evidence in this case fails to show that there was ever any delivery of the alleged deed. The testimony on the part of the plaintiffs is to the effect that the deed had been sent to Ozark by some one unnamed and unknown, had been returned to the postoffice at Logan, delivered there to Uncle Lewis, taken home by him and deposited in a trunk, which was the joint depositary for the papers of Uncle Lewis and Aunt Nancy, and that it remained in the trunk until after her death. There is no evidence that she ever claimed title or asserted ownership or assumed any of the prerogatives of ownership. ''The delivery of a deed is complete when the grantor or obligor has parted with his dominion over it, with the intent that it shall pass to the grantee or obligee, provided the latter assents to it either by himself or his agent.'' Ellis v. Mo. Pac., 40 Mo. App. 165; Tyler v. Hall, 106 Mo. 313; Standiford v. Standiford, 97 Mo. 231. ''The act must have been with the intent on the part of the grantor to divest himself of title, and it must have been accepted by the grantee with the intent to take the title as indicated in the deed. Tyler v. Hall, 66 Mo. 313; McNear v. Williamson, 166 Mo. 358; Hall v. Hall, 107 Mo. 101; Sneathen v. Sneathen, 104 Mo. 201. (3) The testimony of the plaintiffs, all of which was to the effect that the deed was made to protect Lewis Williams from having to pay a ''swindle'' debt, notes given in a Bohemian wheat deal, negatives any possible claim that the transfer, if regularly made, was intended either as a gift or an advancement. If their testimony is taken as true and the property was actually conveyed to Henry Williams for this purpose, viz., to save Lewis Williams from unjust litigation, then when the necessity ceased, it should have been conveyed back to him. Darrier v. Darrier, 58 Mo. 233; Davis v. Davis, 92 Iowa, 147.

*Page & Barrett* for respondents.

(1) Where the evidence is conflicting, the Supreme Court in equity cases will defer to the finding of the

chancellor who can see and hear the witnesses. Barbee v. Bank, 240 Mo. 297; Creamer v. Bivert, 214 Mo. 473. (2) A deed with a certificate of acknowledgment, both regular on their face, and recorded, is prima-facie evidence of the validity of the conveyance and its delivery. Sec. 2208, R. S. 1919; Elliott v. Shepherd, 179 Mo. 382. And to impeach a deed and overcome this presumption, the evidence must be clear and satisfactory. Webb v. Webb, 187 Mo. 540; Barrett v. Davis, 104 Mo. 549; Elliott v. Shepherd, 179 Mo. 382; Barbee v. Bank, 240 Mo. 297; Burk v. Pence, 106 Mo. 315. (3) This conveyance was not a resulting trust. (a) A conveyance from husband to wife raises the presumption that the conveyance is for her benefit and is an advancement. Darrier v. Darrier, 58 Mo. 222. (b) To establish a resulting trust in favor of a husband in property standing in the name of his wife, the evidence must be clear and convincing. Medlin v. Morris, 243 Mo. 260; Williams v. Keef, 241 Mo. 366; Derry v. Fielder, 216 Mo. 176; Sharp v. Berry, 60 Mo. 575. (4) "If the voluntary conveyance is for some illegal or fraudulent purpose, whether it is a common law or a modern conveyance, no trust will result to the grantor; as if the voluntary conveyance is made to hinder and defeat creditors." Perry on Trusts, sec. 165; Sell v. West, 125 Mo. 621; Creamer v. Bivert, 214 Mo. 473.

SEDDON, C.—Suit for partition of ninety acres of land in Christian County, originally instituted in the circuit court of that county. The petition is in the usual form, alleging that plaintiffs and all of the defendants, except Lewis Williams, are the owners of said land, of which Nancy Williams, the deceased wife of defendant Lewis Williams, died seized and possessed in fee simple, subject to the curtesy or life estate of defendant Lewis Williams; that plaintiffs and said defendants, except Lewis Williams, are the sole heirs at law of said Nancy Williams, and that each is the owner of an undivided one-seventh interest in said land, subject to the curtesy of

Lewis Williams; that said land is not susceptible of partition in kind and that the debts of the deceased ancestor have been fully paid, and prays that the respective interests of the parties in said land be decreed and that the land be sold and division of the proceeds of said sale made according to said respective interests.

The answer of Lewis Williams denies generally all the allegations of the petition, and specifically denies that plaintiffs and the other defendants have any interest in the land, but on the contrary affirmatively pleads that "he is the sole and absolute owner of the same and has been in the open, notorious and exclusive possession thereof for the last thirty years and is now in such possession; exercising all the acts of ownership and holding the same and paying taxes thereon during all said time to the exclusion of every other person whatsoever. This defendant further says he is informed and believes that plaintiffs claim some right, title or interest in the land by reason of two certain deeds of record in the Recorder's office of Christian County, dated November 9, 1888, wherein it is recited that for a consideration of $3,-000 the defendant and his wife, Nancy Williams, quitclaimed said land to W. H. Williams and the said W. H. Williams purports to convey the same to Nancy Williams, the deceased wife of defendant and the mother of plaintiffs, for a like consideration, and said deeds are a cloud on defendant's title; that defendant never executed or delivered the first deed described and, at the time same purports to have been executed and ever since, defendant owned and held title to said land and has been in the exclusive possession thereof, claiming title against every other person whatsoever." Defendant prays the court *nisi* by its decree to declare said deed void and of no effect, that the title to said land be declared to be in defendant and that the other parties plaintiff and defendant be decreed to have no right or title therein.

Plaintiffs filed reply to said answer, averring that Lewis Williams and Nancy Williams, husband and wife, resided on the land and that title thereto was vested in

Nancy Williams, who had possession and exercised ownership thereof, by virtue of the deeds mentioned in defendant's answer.

The other three defendants, heirs of Nancy Williams, answered, disclaiming any interest in the land, but stating, on the contrary, that the same belongs to Lewis Williams. Plaintiffs replied to this answer, alleging that said defendants had contracted and agreed with defendant, Lewis Williams, that in case he succeeds in obtaining a cancellation of the deeds mentioned in his separate answer and in vesting the title in himself, the said Lewis Williams will at his death give and bequeath the land to the other defendants and will exclude plaintiffs from his bounty.

Upon change of venue, the suit was transferred to Lawrence County, where it was tried by the court as a suit in equity without the aid of a jury.

Plaintiffs, to sustain the issues on their part, offered in evidence the two original quit-claim deeds mentioned in the answer of defendant, Lewis Williams. The first deed is a quitclaim in the usual form, dated the 9th day of November, 1888, and purporting to be executed and sealed by Lewis Williams and Nancy Williams, his wife, by their respective cross-marks, witnessed and attested by J. M. Titterington and T. W. Grammer, whereby grantors, for an expressed consideration of three thousand dollars, remise, release and forever quit-claim the land in controversy, particularly described, to W. H. Williams of Lawrence County, Missouri, as grantee. The deed purports to have been acknowledged by grantors in Lawrence County on November 10, 1888, before J. J. Baker, a notary public, who certifies to the acknowledgment in his certificate upon the deed in statutory form. Appended to the deed is the certificate of the Recorder of Deeds of Christian County, reciting that it was filed and recorded in the deed records of said county on November 12, 1888.

The second deed is a quit-claim in the usual form, dated the 9th day of November, 1888, executed and sealed

307 Mo. Sup.—44.

by W. H. Williams, whereby, for an expressed considera-
tion of three thousand dollars, he remises, releases and
forever quit-claims the same land, particularly described,
to Nancy Williams of Christian County, Missouri, as
grantee. This deed purports to have been acknowledged
by grantor in Lawrence County on November 10, 1888,
before J. J. Baker, a notary public, who certifies to the
acknowledgment in his certificate upon the deed in stat-
utory form. This deed was likewise filed for record and
recorded in the deed records of Christian County on
November 12, 1888. Having made a prima-facie case by
the introduction in evidence of said deeds, plaintiffs
rested.

It appears from the evidence that Nancy Williams
died in November, 1920, and left surviving, as her sole
heirs, the parties to this suit, and her husband, the de-
fendant, Lewis Williams. Lewis Williams bought the
land in controversy in October, 1881, and it was conveyed
to him by warranty deed, which was recorded in Chris-
tion County on October 31, 1881. The consideration ex-
pressed in the deed is $2850. He testified he paid the
consideration himself, and always paid the taxes on the
land from the date of purchase to date of trial of this
suit, taking the tax receipts in his own name. The tax
receipts are in evidence and substantiate defendant's tes-
timony in this respect. The evidence tends to show that
Lewis Williams and his wife, Nancy, resided on the land
continuously from the time of the purchase in 1881 until
Nancy's death, in 1920, and that Lewis Williams has
since continued to reside thereon; that during all of
said time Lewis Williams farmed the land, controlled
its management, sold the crops raised thereon and col-
lected the moneys arising from such sales. Lewis tes-
tified that his wife had no source of living or income
except what he gave her. With respect to the quit-claim
deeds in question, he testified: "I am about eighty years
old. I cannot read or write. I can't read a word and
never signed my name to anything. I never signed any
deed to Henry Williams for my farm in the presence of

J. M. Titterington or T. W. Grammer or anyone else. I never authorized my son Jeff to sign any deed for me and never executed any such instruments. I never made any conveyance of this land for the purpose of beating my debts. I don't recollect how long it has been since I found out these quit-claim deeds were on record. Harrington told me these deeds weren't worth a dime. I never discussed these two quit-claim deeds with Harrington. I heard him talking about the deeds, Bill Neale and several others, and asked him what he thought of them and he said they weren't any good. He didn't mention any deeds of mine nor did he tell me that the deeds we had all made weren't any good, for I didn't tell him that I had made deeds like that. I never made any deed. I did not have these deeds recorded, nor did I ever have any wheat deeds recorded. I don't know who did. My property never stood in Aunt Nancy's name that I know of. The property stood in my name. I had heard of a man named Baker that used to live in Marionville, but I never went to his office. I knew a man named Grammer, but was not very well acquainted with him. I never signed a deed for anybody. I don't know as it ever stood in her name. I don't know about these quit-claim deeds and I didn't sign up any. I don't recollect whether or not I talked with Mrs. Keener and this girl about fixing up these deeds. They were found in an old trunk. I never had my hands on them. It was my own trunk, but I don't know when they were put there, and if I did I didn't know what they were. I never made this deed or had it done and didn't have anything to do with it. I didn't know that they were made. I never discussed it with my wife, for she couldn't read and didn't know any more about it than I did. I never told her I was putting the property in her name to keep from paying the wheat notes. I didn't get the $3,000 these deeds mentioned, and never saw $3,000 at one time. I didn't try to get the girls to sign a deed and the land back to me.''

W. H. (Henry) Williams, grantee in the quit-claim deed from Lewis Williams and wife, and grantor in the deed to Nancy Williams, testified for defendants:

"Q. You are the same Henry Williams that is mentioned in that deed, W. H. Williams? A. Yes.

"Q. You are the man? A. Yes, I am the party.

"Q. I will get you to examine the deed here. Is that your signature there, Mr. Williams? A. It is.

"Q. I see there is a consideration paid by you of three thousand dollars. ' Tell the court whether you paid any money for that deed being made to you? A. No, sir.

"Q. Who approached you? How did this deed come to be made to you? A. Why, Jeff Williams approached me.

"Q. Did you ever see Uncle Lewis Williams there when he learned that the deed had been made to you. A. No, sir.

"Q. Who were the parties that were there, if any one, besides Jeff Williams? A. Well, I don't know of anyone there but the judge, the magistrate, the one that swore me in.

"Q. Nobody but the magistrate? A. No, sir.

"Q. Do you remember anything that was said or done there by Jeff Williams, there at that time? A. Jeff came to me and approached me on the subject, and he said his father was into some trouble about some notes that he signed in the wheat trouble in some way.

"Q. Jeff told you that? A. Yes, sir, and he said he wanted to change, to get his land out of these notes, to save his father from paying the notes, as I understood it, and he asked me if I would help him out and I said I would.

"Q. Did he say his father wanted to do it, or did he say that he wanted to do it, Jeff? A. Well, I suppose—I taken it for granted that it was his father.

"Q. You took it for granted? A. Yes.

"Q. Was his father there? A. No, his father wasn't there.

"Q. You never saw his father sign these papers, this deed? A. I did not, no sir.

"Q. Was Nancy Williams, the wife of Lewis Williams, there at that time? A. She was not. I supposed

all the time that Uncle Lewis was interceding through Jeff, but I never heard him say that. When he signed the papers I don't know whether Jeff was there or not. I went by the magistrate's, and Jeff explained to me, too, and I couldn't swear whether Jeff was there or not. But he had explained to me in regard to the deed. None of these deeds ever got into my possession. I think Mr. Baker, the notary public, handed me the deed to sign. I don't know whether Jeff was in the office at the time. I did not sign the deed at the same time that this other deed was signed. I never saw the first papers at all. I just saw the one I signed. I never paid a dollar for the property, although it mentions a consideration of three thousand dollars. I never saw any three thousand dollars, or near that amount, as far as that is concerned. I signed the paper and went on about my business, and I supposed all the time that Uncle Lewis was interceding between Jeff, for I didn't know his business. I never heard Uncle Lewis say that, however. Jeff explained it to me and told me he wanted to save his father from paying these notes. The paper that bears my signature I signed and acknowledged. I signed that. That is my handwriting. I understood that Uncle Lewis was in this Bohemian wheat deal. I never heard him make any statement about contesting the note. I naturally supposed and I always thought that Uncle Lewis was the one that Jeff was interceding for, but Uncle Lewis never talked to me. Baker was in his office when I signed the deed, or signed the paper, and I went in there. Jeff spoke to me in regard to signing his father's property over. I do not remember of seeing Uncle Lewis and Aunt Nancy in Marionville about that time. I understood Uncle Lewis was scooting his property to keep from paying this wheat note in case he was stuck on it. That was my understanding. As a matter of fact, I understood through the conversation that I had with Jeff that he was trying to avoid paying these notes.

"Q. That Jeff was or who? A. That Uncle Lewis was.

"Q. Did Uncle Lewis tell you that? A. Neither of them said a word to me. It has been a long time and I don't remember. The idea I got was that he was trying to protect his father. Uncle Lewis wasn't in the community as I know of the day I signed my name to the deed. I walked up the street and signed those papers. I don't remember having seen him in town a short time before that, nor do I remember that I didn't. I have always been friendly with Uncle Lewis and have been friendly with all of them always."

Otis Douglass, testifying as a witness on behalf of defendants, said: "Jeff Williams came to my office a year or more ago and talked to me about the execution of these deeds. I am kind of kin to the family and he just stepped into my office and told me about the trouble they had had. He said they had made those deeds with the idea of beating some Bohemian wheat swindle. Some kind of a note his father had given on account of the Bohemian wheat deal—that they had made these transfers in order to defeat the payment of it. He said he had framed the deed—he had fixed the deeds to save his father from this swindle and from paying the notes. He just came in and volunteered this information to me, that him and Henry Williams had fixed this up on the understanding that he was to be used as a straw man to defeat the payment of these Bohemian wheat notes. There was some kind of wheat swindle mixup in it and that he was trying to save his father. He didn't say anything about his father signing the deeds, or that he didn't sign them. As I understood it, he used Henry Williams as a straw man to help defeat the payment of these notes—to get the title away, for his father's farm."

J. M. Titterington, called as a witness for defendants, was asked to examine the deed purporting to have been executed by Lewis Williams and wife, and whether the signature as a witness to the execution indorsed thereon was his own signature. He testified: "I don't think it is. I don't have any remembrance of ever having signed a deed as a witness to the signature of Uncle Lewis

Williams and Nancy Williams, his wife. I last heard of Grammer around Marionville a long time ago—twenty-four or twenty-five years. I do not remember him signing any deed with me. I know Baker, the man who purports to have taken this acknowledgment there, but couldn't tell you where he is. I testified in a case in the circuit court that if this was my signature it didn't resemble my writing. I didn't say that it resembled my writing and looked like my signature, but that I had no recollection of it. I did say that I had no recollection of signing it and I didn't think that it was my handwriting. I have no recollection in the world of witnessing this deed. I didn't write it. That is not my handwriting.''

Lee Wilson, defendants' witness, testified that he had at one time procured a purchaser for the land and ''I asked Uncle Lewis if he wanted to go on with the sale and he said to his wife, 'What do you think of it?' and she says, 'Well, where would we go?' or, 'Where would we move to?' or something like that. She said, 'We wouldn't have any home if we turned it loose.' She said, 'If we could get that twenty acres of land over there of Aunt Nan Phillips's.' That is twenty acres right in the edge of town. I told them I didn't know whether they could buy it or not, and after they talked it over for awhile they decided not to sell and I went back home and no sale was made. I never had any other dealings with Uncle Lewis about the farm and never heard Mrs. Williams say anything that indicated that she claimed the farm. Uncle Lewis never mentioned the quit-claim deeds given or asked if they were any good.''

William Wiles testified on behalf of plaintiffs: ''As for the sale of the real estate, I recall that he (Lewis) talked to Aunt Nancy about the sale of this real estate lots of times and she objected to him selling it. He was getting old, and he wanted to sell it and move to town or get a smaller place, and he said his wife wouldn't do it. In after years he never said anything to me about these deeds, only he came to my house and wanted my wife to deed it back to him. He said he had had them

made to protect his wife and children. It related to this wheat deal. He said he had these deeds made to protect his wife and children. Told my wife so, he said, 'To keep them from losing what he had.' ''

Jefferson Williams testified for plaintiffs: ''I am the oldest son of Lewis Williams. I know something about the execution of these two quit-claim deeds in 1888. I was in Texas in the spring of 1888 when my father wrote me that he had bought some wheat and asked if I would come home. I came to father's and he and mother were talking over that wheat business. He said he was going to town and wanted to change the deeds and when I asked him who he was going to make it to he said, 'to Henry.' I asked him why he didn't make it to mother and he said it wouldn't bear a bead, which is an expression meaning that it wouldn't be any good. I asked him what would happen if he made the deed that way and someone was to die and he said we will make that and change it right away. A day or two afterwards mother and father were in town and father told Uncle Horn that he was ready for the money. I went into Uncle Horn's office and told him that mother was ready for the money and he said, 'All right, I have it ready for her,' that is all I know about the money. I never counted it or done nothing to it up there. Uncle Lewis and mother were on the sidewalk close to this man Baker's office when I took the money back. I don't ever remember seeing Baker or anything about him. I never said anything to Henry Williams about being á straw man or about this proposition that I remember of. I wasn't there when they signed the deeds. I don't remember where they went when I gave her the money. I was around home the next summer up to August. There wasn't any more said about the deeds. I married and moved away. About 1914 father came to my place in Joplin and said something about putting me on the farm if he could get mother to sign the deed and I told him there was no use bothering as I would live where I was. After mother died he was up there in January this month a year.

After a day or two father got a letter from Douglass and asked me to read it to him. I opened the letter and Douglass says, 'Uncle Lewis did Henry Williams put that quit-claim deed, is that on record at Ozark?' and he says come down. 'Something else has got to be done.' I says, 'Father what is it now?' 'Well' he says, I can't find that Henry Williams deed. Do you know anything about it?' I said I never saw it. He says it is on record. 'Well,' he says, 'who recorded it?' I said, maybe Henry had it recorded if it is made to him. He said, the other deed is there, meaning the one Henry made back. I says Henry, I guess, had the other recorded. Somebody had to have it recorded. I says why didn't you get that fixed back while mother was living. He says, she never would do it. I said, you are up against it. He said, you go and see these girls and see what they will say. I said, I can see them. I went and saw my sisters and asked them about it. They said they believed they would leave things the way they stand and father could hold it his lifetime anyway. I never did hear him say that these deeds were made. When I reported back that I had seen the girls and that they refused to sign the deeds he said if I can't get these deeds back, if they order a partition sale we will sell the land and wind it up and I will take my part. That was one day and I was talking to him the next day. He said he was going to sue for these deeds back and he would see that none of them got anything. I advised him to go to an attorney. At the time of my mother's death my father had possession of these deeds I guess. He took them out of the trunk and he showed them to me. That was the first time I ever saw them. I don't know whether this $3,000 consideration mentioned in the deed was contained in the roll of bills. It was about a day after he was in there that these deeds were made. It was the same day that these deeds were made that this money was advanced. I don't know why they handed the money to me. They told me to get the money. My father and mother were there. Probably they had a secret that they didn't want

anybody to know. I don't know why Horn Melton handed it to me. I took the money and handed it to my mother just as they told me to. I didn't know how much money it was, it was just a roll of bills. I understood that this roll of bills was the consideration for the deed. I didn't know what the consideration of the deeds was until father showed me the deeds. Horn Melton handed me the money. My father and mother were in town at the time. I took the money and gave it to mother. I don't know what she done with it. I don't know whether Horn Melton ever took a mortgage or not, he never got any from me. I did not know anything about the making of these deeds, although I was in Marionville at the time. All I know was what I heard mother and father talking about it and what has come up since. I don't know whether my father paid this $3,000 to Horn Melton or not. Father and mother told me to go and get the money. They were together and told me that. They didn't tell me what they were going to do, but they were going to get something to make the transaction look legal. I didn't go and take the deed to Henry Williams that was signed by him.''

Plaintiff Goldie Keener testified: "I am the daughter of Lewis and Nancy Williams. I know my father and mother were talking about having these deeds made and went to town to have it done. I was at pa's at that time. They said they were going to make the deeds to beat that wheat debt and keep from paying it. They went to town in a wagon. It was afternoon when they got back. They didn't bring the deeds back that day. They got them later out of the post office and pa brought them and gave them to mother and said, 'Nancy, here are these deeds' and mother turned around and said, 'Read them,' and I read them. Mother could not read or write. They got the deeds at Logan. I supposed they came from Ozark.' He said here is these deeds, Nancy. I saw the deeds when he got them out of the post office at Logan. When I read the deeds over to my mother she told me to put them in the trunk and there is where I put them.

I put them in hers and his trunk. They had a little trunk that they both used and put papers in together. They said they were going to fix up a deed to keep from paying the debt, the swindle debt they called it. Several times he wanted her to sign deeds back and she said if you will make it equal with the rest of the children I will sign a deed and he said, 'I won't do it.' ''

Plaintiff Mrs. Wiles testified: ''I heard them repeat it time and again about the deeds and where the title to the land was and in whose name it was. I never hardly missed a week that I wasn't over to mother's place. Father came to my house and wanted me to sign the deeds back to him and I said, 'pa, how came you to make these deeds?' and he said, 'To beat the wheat debts and some security debts,' and I said, 'Pa, what do you want the deeds back for?' and he said 'I want to sell it,' and I said, 'What do you want to sell it for?' 'I want to do as I please with the money.' When he said he wanted to do as he pleased with it I said, 'There's nothing doing.' ''

Jack Coleman testified as a witness for plaintiffs. He told of a conference of persons who were interested in the Bohemian wheat deal held in a store at Marionville. The meeting was attended by witness's father and Uncle Horn Melton and others and ''I am pretty sure that Uncle Lewis was at that conference and they were advising about making a deed to some other party for a fair consideration of the property and then to have it deeded back to their wives. I think Uncle Lewis was one of the persons that made a deed. There was quite a bunch there. If I could find my old rate book, I could tell you the names of everyone that made a transfer. I did not see Uncle Lewis make the deed. All I can say about it is this; in business transactions you know we have a general understanding about a matter and my understanding was the deed was made and the object of it was to avoid paying this wheat note. I couldn't say who made these deeds without this book. I think the body of these deeds (the two quit-claim deeds in evidence)

were written by a man by the name of Powell. He was the man with Baker in the furniture business. My judgment is that is his handwriting."

Tom Carney testified that he had been associated in business with Horn Melton in 1888 and never knew Melton to make a bad deal and, in lending as much as $3,000, Melton would have required good security for the loan. Melton did not usually keep much money on his person. Witness identified the signature of J. J. Baker, the notary who took the acknowledgments to the deeds in controversy, as genuine, and testified, "It looks very much like the signature of T. W. Grammer, all right."

Lee Wilson also identified the signature of J. J. Baker, the notary public, to the certificates of acknowledgment on the deeds. Testimony was adduced that J. J. Baker, suddenly disappeared over night some time afterward when threatened with criminal prosecution for a felony. Baker's trouble, however, did not arise out of a business transaction, but because of some trouble with a woman.

The defendant Lewis Williams was recalled in rebuttal and testified: "I never did write my son Jeff a letter down in Texas. I can't write and I never write any letters and I never had anybody write to him for me. I heard about him testifying about me going to town to make these deeds. I was never around town making these deeds at all and I heard Mr. Coleman's testimony about me going over to Marionville to attend a meeting about these wheat notes. If I ever attended a meeting I had forgotten about it. When these deeds was made I had paid one of these notes. I don't know what became of the other one. I never heard of it and no one ever asked me to pay it. The deeds were not made to prevent paying the other note. I don't recollect when these deeds were made. I never signed up any deeds. I never was at a meeting at Marionville. I didn't have any friction with my wife about these deeds, nothing that I ever knew of. She would always claim they wasn't any account and nothing to cause any friction over."

Upon the foregoing evidence, the court *nisi* entered a decree finding the allegations of the petition to be true; that Nancy Williams at the time of her death was the owner in fee of the described land; that her surviving husband, Lewis Williams, has an unassigned homestead in said land and as tenant by curtesy is entitled to a life estate in the whole of said land and that the other parties, plaintiff and defendant, are the sole heirs at law of Nancy Williams and are each entitled to a one-seventh part in remainder in said land. The court also finds that defendant Lewis Williams is not the owner in fee of said land as alleged in his answer, and, inasmuch as plaintiffs do not ask admeasurement and assignment of the homestead and defendant Lewis Williams does not consent to partition according to the interests found and set out in the decree, the right of partition is denied and the parties are adjudged and decreed to hold and own said land in the manner and according to the interests set forth in the decree. From this judgment defendants have appealed to this court.

I. Appellants assign error in the admission in evidence, over their objections, of the quit-claim deed to W. H. Williams purporting to have been executed by Lewis and Nancy Williams, his wife, without any proof of its execution. Section 2207, Revised Statutes 1919, provides: "Every instrument in writing, conveying or affecting real estate, which shall be acknowledged or proved, and certified as hereinbefore prescribed, may, together with the certificates of acknowledgment or proof, and relinquishment, be read in evidence, without further proof." In Barbee v. Farmer's Bank of Polo, 240 Mo. l. c. 306, this court has said: "We have construed this section to mean that the certificate of acknowledgment takes the place of proof that the deed was signed and delivered; that it is prima-facie evidence that the deed was duly executed, that is, that it was signed and delivered." Such has always been the rule in this State. [Burk v. Pence, 206 Mo. l. c. 339; Elliott v. Sheppard, 179 Mo. 382; Akins v.

*Deed as Evidence.*

Adams, 256 Mo. l. c. 8.] The introduction of the original deed, properly acknowledged as it was, in evidence, made a prima-facie case for plaintiffs, and no error was committed by the court *nisi* in its admission without further proof of its execution and delivery.

II. Appellants contend that the trial court erred in not finding for the defendant Lewis Williams on the issue raised by his answer and plaintiffs' reply thereto, as to the execution and delivery of the deed to W. H. Williams, and that the finding of the trial court for plaintiffs is against the weight of the evidence and contrary to all the evidence.

It has long been the established law in this State that, in order to impeach a deed, regular upon its face and properly acknowledged, the proof must be

Delivery: Weight of Evidence.

clear and satisfactory. In Elliott v. Sheppard, 179 Mo. l. c. 392, we have said: "This court, in a number of cases, has spoken in no uncertain terms as to the nature and character of the testimony which will warrant the overthrow of the force and effect of a deed, duly acknowledged, all of which appears regular upon its face. The expressions of this court, as well as the other appellate courts, are uniform —that to warrant the finding that such deed and certificate of acknowledgment is untrue, the evidence must be clear and satisfactory." [*Vide* cases there cited.]

Upon the testimony adduced we cannot say the proof is sufficient to overcome the prima-facie case made by plaintiffs in introducing the original quit-claim deeds in evidence. Nor can we say the finding of the learned chancellor who tried the case is against the weight of the evidence. We must bear in mind that the deeds in question had been of record in the office of the Recorder of Deeds of Christian County for more than thirty-two years prior to the institution and trial of this suit. Time dims the memory of the human mind, and, while there is some slight discrepancy in the testimony of the various witnesses, yet in the main there is substantial testimony to the effect that the deeds in question were exe-

cuted and delivered, that they were forthwith recorded and returned by mail to Lewis Williams, who delivered them to his wife, Nancy, saying, "Here are the deeds," that they were read to Nancy, presumably in the presence of the husband, and were placed for safe-keeping in a trunk jointly used by the husband and wife. Lewis Williams, himself, admits they were found in this trunk after his wife's death.

Appellants intimate that the evidence tends to show the deed to W. H. Williams was forged. We do not so read the record. True, the witness Titterington denies that he attested the execution of the deed, but his testimony as a whole is far from positive, for at best he says, when asked about the genuineness of his signature, "I don't think it is. I don't have any remembrance of ever having signed the deed as a witness. If this was my signature it didn't resemble my writing." On the other hand, other witnesses testified that the signature of the notary public, J. J. Baker, is genuine, and one disinterested witness testified that the signature of the attesting witness T. W. Grammer on the deed "looks very much like his signature."

In weighing the testimony, appellants ask us to give little or no credence to the certificate of acknowledgment of the notary public, Baker, because of, as they express it, "the aspersions cast on the character of the notary, Baker, who had to leave the country between supper and breakfast and has never since returned." But while there is some evidence to the effect that Baker made a hurried departure because threatened with prosecution for a felony, the evidence is equally clear that his departure was due to an "affair" with a woman, and not by reason of some dereliction in business matters. The testimony referred to has little or no bearing upon the genuineness or truth of Baker's certificates of acknowledgment.

Again, appellants say that plaintiffs' prima-facie case is overthrown by reason of proof of Lewis Williams's continued possession of the land and his personal management thereof, coupled with the positive

proof that he had always paid the taxes thereon and received receipts thereof in his own name and not in the name of his wife. But the evidence is conclusive that Lewis and Nancy Williams lived together as husband and wife on the land until the wife's death and occupied the same as their homestead. While Lewis tilled the soil and harvested the increase, Nancy, faithful spouse as she was, performed the household duties and, as Lewis said, "helped to take care of what I made." The mere fact that the tax officers assessed the land in the husband's name and he paid the taxes thereon, taking receipts in his name, is not sufficient to overcome plaintiffs' prima-facie case.

Was there sufficient evidence of non-delivery of the deeds to overcome the prima-facie evidence of their execution and delivery by reason of their introduction in evidence under the statute? We find there was not. W. H. Williams, grantee in the first deed, admitted in his testimony that he executed and acknowledged the second deed conveying the land to Nancy Williams. While he says he never saw the first deed and neither deed was ever in his possession, it is not conceivable that he would execute and acknowledge a deed conveying property to which he never had any legal or equitable title. His action in immediately reconveying the land to Nancy Williams was tantamount to an assent to and acceptance of delivery of the first deed conveying the land to him. It is not essential to constitute a valid delivery of a deed that manual delivery be made to the grantee himself. It will be sufficient if made to another person for his use, and an acceptance will be presumed. [Hall v. Hall, 107 Mo. l. c. 108.] Besides, delivery of a deed may be constructive as well as actual, and delivery is complete when the grantor has parted with his dominion over it, with intent that it shall pass to the grantee, provided the latter assents. [Standiford v. Standiford, 97 Mo. l. c. 238.] There is sufficient evidence in the record to prove that Nancy Williams assented to and accepted delivery of the deed conveying the land to her.

Neither do we deem the testimony of Lewis Williams sufficient to overcome the prima-facie force and effect of the deed to W. H. Williams. While he denies all knowledge of its execution, either by himself or wife, he is the party seeking to impeach the deed. His testimony must be considered in the light of that fact. The voice of his wife, Nancy, is sealed by death. The testimony of other witnesses tends to prove the execution and acknowledgment of the deed.

The suit was tried as one in equity before the court *nisi*. While this court has said that the whole record must come here for review in equity cases so that we may weigh and decide the same *de novo,* nevertheless where an issue of fact rests on the credibility of the witnesses, this court will usually defer to the finding of the chancellor, who has many opportunities, necessarily denied to us, of seeing and hearing the witnesses themselves, observing their demeanor while testifying, and of determining the weight which properly attaches to their testimony. [Creamer v. Bivert, 214 Mo. 473.]

III. Were the two deeds in controversy void or ineffective to pass ownership out of Lewis Williams into his wife, Nancy, for want of consideration?

Consideration. Both deeds, upon their face, recite a consideration of $3,000. W. H. Williams testified he received no consideration for his deed to Nancy Williams and that he "never paid a dollar for the property" conveyed to him. Likewise, Lewis Williams testified: "I didn't get the $3,000 these deeds mentioned and never saw $3,000 at one time." On the other hand, his son Jefferson Williams testified that he was told by his father and mother to go to Horn Melton's office and "get the money." Horn Melton handed him a roll of bills which he then handed to his mother and he "understood this roll of bills was the consideration for the deed." Appellants claim that the testimony of Jefferson Williams is so preposterous as to be beyond belief. Without either granting or denying this premise, neverthe-

less, the deeds themselves recite a consideration of $3,000, and a want of consideration cannot be shown a'gainst the recitation in the deed for the purpose of defeating the operative words of the deed. [Bobb v. Bobb, 89 Mo. 411; Crenshaw v: Crenshaw, 276 Mo. 471.] Furthermore, the effect and evident purpose of the deeds was to transfer or convey the title from the husband to the wife. A conveyance from husband to wife raises the presumption that it. is a gift or advancement. [Darrier v. Darrier, 58 Mo. 222.] It need not, therefore, be supported by a valuable consideration.

IV. Finally, appellants contend that, if the testimony to the effect that the deeds were executed and delivered for the purpose of protecting Lewis Williams against the payment of a debt be taken as true, then a resulting trust arose by implication of law in favor of Lewis Williams and, therefore, his wife, Nancy, held the record title for him. But, as said by this court in Medlin v. Morris, 243 Mo. 1. c. 278: "To divest out of a wife and put into her husband the title to real estate solemnly evidenced by deeds taken by the consent of both (a consent long acquiesced in) in the name of the wife, demands high and stringent proof to prove a resulting trust. To prove such trust calls for evidence clear, cogent and altogether convincing, so that the chancellor can say on his very conscience that an implied trust exists beyond any serious question." To like effect are Williams v. Keef, 241 Mo. 366, and Gammage v. Latham, 222 S. W. 469. As said by SHERWOOD, J., in Shaw v. Shaw, 86 Mo. 594, in speaking of the sufficiency of evidence to establish a resulting trust: "Such evidence must be well nigh conclusive in its character." The evidence here falls far short of meeting the requirements established by our rulings in the foregoing cases.

Besides, a resulting trust cannot arise when the transactions on which the supposed trust is bottomed appear to have had their origin in any fraudulent purpose. [Perry on Trusts (6 Ed.) sec. 165; Sell v. West, 125 Mo. 621; Derry v. Fielder, 216 Mo. 176.]

*Resulting Trust.*

There is substantial evidence that Lewis Williams was indebted at the time of the conveyances by reason of having signed certain notes or obligations arising out of the purchase of wheat. One witness testified to a meeting held at a store in Marionville attended by Horn Melton and several other persons interested in the wheat transaction. He was "pretty sure that Uncle Lewis was at that conference and they were advising about making a deed to some other party for a fair consideration of the property and then to have it deeded back to their wives." He also said he thought "Uncle Lewis was one of the persons that made a deed." One of Lewis Williams's daughters testified that she asked her father how he happened to make the deeds, and that he replied, "To beat the wheat debts and some security debts." Another daughter testified that her father and mother had talked about having the deeds made and went to town for that purpose and "they said they were going to make the deeds to beat that wheat debt, to beat it and keep from paying it." W. H. Williams, the party named in both deeds, said Jefferson Williams came to him and said "his father was into some trouble about some notes that he signed in the wheat trouble and he wanted to change, to get his land out of these notes, to save his father from paying the notes."

Appellants denominate the wheat transaction as a "swindle," and say there is no evidence to show that Lewis Williams was evading, or attempting to evade, any just debt, and consequently the execution of the deeds was not a fraud on his creditors. But the record is silent with respect to the exact nature of the indebtedness or whether the notes had fallen into the hands of innocent purchasers for value before maturity and, hence, were free from defenses. In fact, Lewis Williams, admitted having paid one of the notes, and said he "didn't know what became of the other one, nor the name of the fellow who held it."

A cardinal maxim in equity is that he who comes into equity must come with clean hands. When a party

makes a conveyance for the purpose of hindering or defeating the claim of a creditor, or for any other fraudulent purpose, equity will leave the party where it found him and deny the relief he asks.   [Creamer v. Bivert, 214 Mo. 473; Derry v. Fielder, 216 Mo. 176.]

We find that the findings and judgment of the trial court are supported by all the evidence in the case, and there being no reversible error in the record, the judgment is affirmed.   *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court.   All of the judges concur, except *Atwood, J.,* not sitting.