# JACKSON CREAMER v. ROSALIE BIVERT, Appellant.

### Division One, November 25, 1908.

1. **EQUITY: Issues of Fact: Appellate Practice.** Where an issue of fact rests in equity alone on the credibility of witnesses, the appellate court will usually defer to the finding of the chancellor, who has many opportunities denied to the upper court of determining the weight which properly attaches to their testimony.

2. **CONVEYANCE: Delivery: Record.** If the deed was never delivered, it never became operative as a conveyance, whether recorded or .not. But if delivered, its record did not as between the parties add to or detract from its validity as a conveyance.

3. ————: **Executed.** To speak of a deed as executed, means not only that it was signed, but also that it was delivered. And to allege in the bill that the deed was "executed" is, in a broad way, to allege that it was delivered.

4. ————: **To Perpetrate a Fraud: Delivery.** Where plaintiff was sued by a woman for breach of promise and in order to defeat execution under any judgment she might obtain, signed and acknowledged a deed conveying his land to his sister and handed it to her, to be handed back to him at his request, as he says, the controlling fact as to whether or not there was a delivery of the deed is that delivery was essential to consummate the fraudulent purpose, and that purpose being alleged in the petition, and shown by the evidence, and the preponderance of the creditable testimony being to the effect that there was a delivery, the plaintiff's bill to have the deed set aside should be dismissed, even though no consideration passed, and even though there was an understanding between them that the title should be conveyed back to him when his troubles were at an end, for such an understanding assumes that the title had passed. [Distinguishing Bunn v. Stuart, 183 Mo. 375.]

5. ————: ————: **Setting Aside Deed: Clean Hands.** The rule that he who comes into a court of equity must come with clean hands, is a cardinal one; and its application does not depend upon the averments of the pleadings, or the wish of counsel, but it may be invoked and applied by the court of its own motion. Where plaintiff made a deed to his sister for the fraudulent purpose of defeating an anticipated judgment creditor, and the sister accepted the deed knowing that was its purpose, equity will let them lie in the bed they made for themselves, and will dismiss his bill to have the deed set aside, and her cross-bill asking that the deed be confirmed and the title declared to be in her.

Appeal from Gentry Circuit Court.—*Hon. Wm. C. Ellison,* Judge.

REVERSED AND REMANDED (*with directions*).

*C. E. Ernst* and *C. H. S. Goodman* for appellant.

(1) The burden of proof was on plaintiff to establish the facts of the non-delivery of the deed, and the non-payment of the consideration expressed in the deed, by evidence so cogent, clear and convincing as to leave no reasonable doubt in the mind of the chancellor. This is the rule whenever it is sought to deprive one party of a vested estate, and vest the same in another. Worley v. Dryden, 57 Mo. 226; Allen v. Logan, 96 Mo. 591; Atkinson v. Henry, 80 Mo. 151; Jackson v. Wood, 88 Mo. 76; Keiser v. Gammon, 95 Mo. 217; Pitts v. Weakley, 155 Mo. 109; Mulock v. Mulock, 156 Mo. 431; Viers v. Viers, 175 Mo. 444; McKee v. Higbee, 180 Mo. 263; Smith v. Smith, 207 Mo. 533. (2) The conveyance sought to be set aside was duly delivered. When a deed has been executed and acknowledged, the possession of it by the grantee is presumptive evidence of its delivery. Green v. Yarnall, 6 Mo. 326; Rogers v. Carey, 47 Mo. 232; Scott v. Scott, 95 Mo. 300; Souverbye v. Arden, 1 Johns. Ch. 240; Methodist Church v. Jaques, 1 Johns. Ch. 450; 5 Am. and Eng. Ency. Law (1 Ed.), 447; 3 Washburn on Real Property (6 Ed.), secs. 2165, 2169. (3) If the deed was delivered with the object and purpose to defeat a prospective judgment creditor, while it might have been fraudulent as to said creditor it was valid and binding as between plaintiff and defendant, and plaintiff cannot impeach it. Mulock v. Mulock, 156 Mo. 442; McLaughlin v. McLaughlin, Admr., 16 Mo. 242; Caldwell v. Bower, 18 Mo. 375; George v. Williamson, 26 Mo. 190; Merry v. Freeman, 44 Mo. 518; Hall v. Callahan, 66 Mo. 316; Larimore v. Taylor, 88 Mo. 661;

Hayes v. Fry, 110 Mo. App. 20; Knapp v. Knapp, 118 Mo. App. 686. (4) The deed of May 15, 1890, was not an escrow. A deed can never be an escrow if delivered to the grantee unless for the express purpose of being handed to a third party, even though accompanied with an express condition and not to take effect unless such condition be complied with. The title will nevertheless pass by such delivery. 3 Washburn on Real Prop. (6 Ed.), sec. 2176; 4 Kent (11 Ed.), side page 454; State v. Potter, 63 Mo. 212; Massman v. Hatcher, 49 Mo. 87; Henshaw v. Dillon, 59 Mo. 139; Jones v. Shaw, 67 Mo. 667.

*Allen, Gabbert & Mitchell, W. F. Dalbey* and *R. L. Nichols* for respondent.

(1) A deed, without consideration, delivered to grantee under a distinct understanding that it was not to be recorded, and was to be returned at any time thereafter when the maker should call for it, was never delivered, and such deed would not become operative to convey the title. Bunn v. Stuart, 183 Mo. 375. (2) Chancery courts will defer to the finding of the lower court when the evidence is conflicting. Chouteau v. Allen, 70 Mo. 336; Chapman v. McIlwrath, 77 Mo. 43; Springer v. Kleinsorge, 83 Mo. 159; Mathias v. O'Neill, 94 Mo. 530; Gottschalk v. Kircher, 109 Mo. 170; Bartlett v. Brown, 121 Mo. 364; Kinzer v. Kinzer, 130 Mo. 131; Bemis Bros. Bag Co. v. Ryan Com. Co., 74 Mo. App. 632. (3) A case on appeal must be disposed of upon the same theory upon which it was tried in the lower court. State ex rel. v. Chick, 146 Mo. 645; Trustees v. Hoffman, 95 Mo. App. 489; Overshiner v. Britton, 169 Mo. 341; Stewart v. Outhwaite, 141 Mo. 562; Novelty Mfg. Co. v. Pratt, 21 Mo. App. 171; Goldstein v. Winkelman, 28 Mo. App. 432; Fullerton Lumber Co. v. Calhoun, 89 Mo. App. 209; Randolph v. Frick, 57 Mo. App. 400; Hollman v. Lange, 143 Mo.

100; Glaser v. Rothchild, 106 Mo. App. 418. (4) There is no question but that the possession of grantee of a deed duly executed and acknowledged is presumptive evidence of its delivery, but such presumption falls in the presence of testimony that there was no such delivery. Bunn v. Stuart, 183 Mo. 375.

LAMM, J.—From a decree of the Gentry Circuit Court adjudging a certain deed conveying one hundred acres of land from plaintiff to his sister, Rosalie, null and void and divesting the record title out of her and into him, defendant appeals.

The bill is subdivided into counts. If that method of pleading be not somewhat of an innovation on modern equity practice, yet the counts as such need no attention, for the *gravamen* of both is the same—the first merely stating the cause of action with more fullness of detail than the second.

It is alleged in the bill that plaintiff is the owner of the north half of the northwest quarter of section 15, and 20 acres off of the south end of the southwest quarter of the southwest quarter of section 10, all in township 63, range 31, in Gentry county, and is and has been for forty years in possession; that on May 15, 1890, he was threatened by one Sarah Kuhey with a suit for damages for breach of promise to marry; that having in view the disposition of his land he "did make and execute" a warranty deed on said date, purporting to convey said real estate to defendant; that he acknowledged it; that defendant induced him to make it by stating to him she would assist him thereby in preventing said Sarah Kuhey "from securing said land or taking said land under and by virtue of any suit instituted or that might thereafter be instituted by her," said Kuhey; that defendant being his sister he implicitly trusted her and relied upon her said statements and promises; that the deed was without consideration; that plaintiff

never intended to part with his dominion or control over it and never delivered it to defendant for the purpose of conveying said land but that when it was handed to defendant "it was mutually agreed by this plaintiff and defendant that said deed executed as aforesaid should be handed to defendant to be held and kept by her for this plaintiff and that said deed should be returned to this plaintiff whenever he should demand same, and that in no event should it be placed on record in the recorder's office in said county and that defendant at the time said deed was handed her by plaintiff promised plaintiff that she would merely hold said deed in her possession without recording same and subject to his recall whenever he should demand same;" that afterwards without plaintiff's knowledge or consent defendant wrongfully and deceitfully caused said deed to be put of record; that afterwards on the 30th day of November, 1900, plaintiff settled his differences with Sarah Kuhey and married her. That afterwards at divers times (without avail) he requested defendant to return said deed, he not knowing it had been recorded; and that when he found it was recorded he requested her to quitclaim the land back but she refused to do so.

The answer admitted Rosalie holds title by virtue of the deed, but denies each and every other allegation in the petition. It next goes on to allege that she is the rightful owner of the premises, that she purchased the same for a full and valuable consideration paid by her; that the conveyance was intended to be operative in conveying the legal title. Based on such allegations, she prayed affirmative equitable relief, viz., that the court declare she is in good faith the legal and rightful owner of the premises, discharged of any equity or trust whatsoever, and for all other and proper relief.

On such paper issues the cause was tried, and the chancellor found (1) there was no consideration for the

deed and (2) there was no delivery of the deed. On these findings the decree went as prayed in the bill.

The case on appeal presents three propositions, *viz.*:

*First.* Was there error, *nisi*, in finding no consideration for the deed?

*Second.* Did the chancellor err in finding there was no delivery of the deed?

*Third.* On all the facts, will a court of conscience interfere?

I. *Of payment.* There was testimony by plaintiff that no valid or valuable consideration passed from defendant to him. Creamer testified that way. He introduced witnesses who testified to facts pointing the same way and strongly corroborative to the effect that in 1890 Rosalie lived in an humble way in the town of Albany and eked out a scant living for herself and family as a washwoman; that she had no visible signs of ready money and practically admitted to others she paid nothing. *Contra,* defendant put in proof on the issue of payment, in substance, that the money was paid shortly after the date of the deed partly out of Rosalie's savings as a washwoman, partly out of her savings in raising and selling chickens, a few pigs and a cow or so each year and partly out of money sent and brought to her by Louis, her son, who on coming to man's estate worked in Colorado in restaurants and saloons at $40 per month and who went to Oklahoma at the opening of the territory for settlement. This money had been kept in a wardrobe in an upper chamber hid in the lining of an old fur muff, which said muff had a somewhat picturesque and variegated career. Not only was it at the start a wedding present, and presently the family money chest, but at a certain time it was put out in the sunshine to rid it of moths when a puppy (not understanding or respecting the purpose of its appearance within his reach and runways, nor its

value as a family receptacle for money) appropriated it to his own use and, when through with it, it became straightway a reminiscence as distinguished from a fact susceptible of tangible evidence by tender in open court.

If the issue of payment or no payment is to be determined by the mere bulk of the testimony and the number of the witnesses pro and con then defendant had the better of it, for the existence of the muff, its use in secreting treasure, the existence of the hidden treasure itself and its appropriation in paying for the land are shown by the copious testimony of several members of the Bivert family. As against their positive testimony stands that of plaintiff himself supported by corroborative proof of the character stated. But the justice of a cause does not alone hang or turn on the count of witnesses on the fingers, or on mere numerical weight. That (by itself) would be a crude rule for establishing a fact. The philosophy of the plan of getting at the fact, in cases of conflict in testimony, has deeper and more sure guides than such easy scheme. Here there was a maze of testimony affecting the credibility of some of the witnesses on both sides—there were currents and cross-currents in it sharply affecting the probability and the improbability of the stories told on the stand. The bulk of the testimony was oral. In such condition of things, while this court has said over and over again that the whole record must come here in equity cases so that (sitting as the final arbiter in chancery) we may weigh and decide *de novo* and thus do equity, yet the court is also fond of saying that deference should be given to the trial chancellor. He sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract

in a court of last resort.   She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case.   To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien.   The brazen face of the liar, the glibness of the schooled witness in reciting a lesson or the itching over-eagerness of the swift witness, as well as honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light and yet not a soul who heard it, *nisi*, believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print and yet there was that about the witness that carried conviction of truth to every soul who heard him testify.    Therefore, where an issue in equity rests alone on the credibility of witnesses, the upper court may with entire propriety rest somewhat on the superior advantage of the lower court in determining a fact.

 Therefore it is our opinion that if there is nothing in this case but the issue of payment or no payment we would not disturb the decree.

We are furthermore of the opinion that the issue of payment, whether found for plaintiff or defendant, is not a deciding one, but that the controlling questions are the second and third propositions.   This conclusion makes it a useless task to state the evidence at large relating to payment and brings us at once to the remaining propositions—propositions that depend upon common facts and hence may be considered together, as they are in the next paragraph.

II.    Jackson Creamer's true given name is Jacques, commonly called "Jack" by his plain Missouri neighbors, and dignified as "Jackson" for court

purposes.  Both parties litigant are of French birth,
being born in Lorraine when that was a province of
France.  Neither of them can readily read or write
English, both of them read and write French, we infer.
Neither is shown to have any advantage of the other
in intelligence.  Jacques has served a term in the peni-
tentiary for a felony, Rosalie, in jail for a misdemean-
or.  Nor can we make out from the record that either
of them stood in the relation to the other of business
manager, adviser, or other fixed and settled general
relation of confidence and trust.  True, they were
brother and sister, but their relations in that regard are
not shown to put one in the vantage ground of manag-
ing or controlling the business acts and conduct of the
other.  Nor, under the proof, can it be justly held that
her mind held mastery over his.  It cannot be said in
this case that theirs were "two souls with but a single
thought" (or, as put by Bellinghausen in *Ingomar, The
Barbarian,* "Zwei Seelen und ein Gedanke"), and that
thought hers.

The case stands clear of any fiduciary relation and
the solicitude and jealousy with which courts of con-
science watch and pry into such relation [Stitt v. Stitt,
205 Mo. 1. c. 166] cannot be invoked to aid plaintiff.

In 1882 or 1883 their mother deeded her home—
the land in dispute—to Jacques.  Her record title was
somewhat cloudy.  At the time of the trial Rosalie was
seventy years old.  He, we gather, was also old.  The
land was broken and thin, in 1890 worth possibly $2,000
or $2,500 with a clear title.  Jacques resided on it in
1890 as a bachelor.  Avoiding details, the record dis-
closes that during that year and before he became en-
tangled in an intrigue with his housekeeper and
through sinful inadvertence or evil concupiscence be-
came much "battered in the wars of Venus," to bor-
row for use the figure of a distinguished judge.  As a

result a child was born out of wedlock to them. Thereat, he was arrested for violating the statutes denouncing open and notorious sexual immorality. Not only so, but he was sued by the woman for damages for breach of promise to marry. At that time, his sins having found him out, he was in hard lines. The evidence falling from his lips and put in by his witnesses shows beyond cavil or doubt that he feared the result of a civil suit, and, casting about him for a way out, he conceived the plan of circumventing the woman by disposing of his real estate. His first plan was to deed it to one C, who was to borrow $700 on it, turn the money over to him and then deed the land back subject to the loan when his troubles were over, if ever. This plan miscarried because of irregularities in the title. Thereupon a new scheme was hatched, to-wit, that the land should be conveyed to Rosalie, who lived in Albany three or four miles away. The testimony shows that a lawyer was consulted by one or both.

It is alleged in the bill, faintly suggested by plaintiff's proof and denied by defendant's, that the scheme finally carried out was hers, that she induced Jacques to make the deed. But we do not find it so, nor did the court below find it that way. It was Jacques, not she, who was stung by the nettle of danger. It was his affair, not hers. His eye, not hers, was looking this way and that for the path of safety out of the brambles of trouble. His, not hers, was the first abortive plan; and undoubtedly he it was that fell upon the second plan as a *dernier* resort. That she fell in with it does not alter the fact. Adam's old and discredited ruse of shifting the blame on a woman must be strongly supported by the proof to be favored in a court of justice.

While there is a divergence and conflict in the testimony on the payment of the consideration, yet there is none on the fact that the physical custody of the deed signed by Creamer, duly acknowledged and recit-

ing the payment, was handed over to defendant either by Creamer himself, or by the attorney who wrote the deed with Creamer's consent. She retained the custody of it until the 11th day of October, 1890, when it was spread of record.

It is asserted on one side and denied on the other that the deed was to be recorded. We deem that issue immaterial; because, if never delivered, it never became operative as a conveyance and, in that view of the case, its record created a cloud on plaintiff's title removable in equity. If, however, it was in truth and in fact delivered, then the title passed and its mere record (standing alone) caused plaintiff no injury and gave him no cause of action. [Cook v. Newby, 213 Mo. 471.] Hence, the real question resolves itself into the delivery of the deed.

The bill contains an allegation that the deed was "executed." Now, to speak of a deed as executed means in law that it was signed, sealed (when that is necessary), acknowledged (when that is necessary) *and delivered.* In a broad way, then, the bill alleges delivery. But the context is of such sort as to show the pleader did not mean it that way. He states in effect that it was not to be delivered—that plaintiff did not lose dominion over it but that it was to be handed back to him at his request. There is testimony sustaining that averment. There is very strong testimony the other way. We are constrained to disagree with the learned chancellor in his finding that there was no delivery. We base our conclusion not only on what seems to us the great weight of the credible oral testimony on that point, but on another and controlling fact, *viz.*: *that delivery was essential to consummate the admitted fraudulent purposes of plaintiff.* He started out to do that very thing, to-wit, commit a fraud. What stopped him? Is it supposable in reason that a grantor who starts out to make a deed for the avowed purpose

of perpetrating a fraud would (absent twinge of conscience or visible obstacle) halt midway in his career of covin and approach to and yet not do the identical thing he set out to do, to-wit, consummate the fraud by passing the title to his grantee by delivering the deed? Was something doing, and yet nothing done? He either delivered that deed or else he perpetrated a fraud within a fraud, *i. e.,* he put himself and the grantee in a fix where, when the worst came to the worst, they both could swear in a court of justice that the deed was delivered. Why should we pick the latter theory in preference to the former and thus add contemplated perjury to the fraud?

We think it must be held there was a delivery of the deed and this is so although it may very well be there was an understanding the title should be conveyed back when the clouds rolled by, if ever. But, observe, an agreement to convey the title back *assumes the fact that the title had once passed,* and that is fatal to plaintiff's theory of no delivery.

Learned counsel for plaintiff rely greatly on Bunn v. Stuart, 183 Mo. 375. At first blush that case is favorable to their view. But well looked to, it is not so. We have read the opinion painstakingly. We have examined the pleadings, abstracts and briefs preserved in the judgment roll of that case. The most to be said is that it has some features in common with the case at bar. But there were other features distinguishing that case from this. In that case an old man had made a will devising certain property to his daughter. Becoming discontented with that form of disposition of the land, he concluded to deed the property directly to her children. These deeds, with others executed about the same time to his own children, were in the nature of a testamentary disposition of his real estate. He held all of them for several months. He then married a third wife and trouble subsequently arising between

them, he made some provision for her and a divorce suit was pending. The record shows that it stood practically conceded in the proofs that all the deeds in question were handed over to the respective grantees about the time of the divorce suit, with the express understanding they were to be kept for the grantor and handed back to him at his request. Some of them were handed back at his request in accordance with the agreement. The grantees in such as were handed back testified to the agreement. The grantees in the deeds placed of record and not handed back did not take the witness stand and deny the agreement. While, as said, the case has some common features to the one at bar, yet the proof is different and it was held there was no delivery. That case, therefore, does not control this one.

After the record of the deed, plaintiff married the Kuhey woman who has since died. There is some evidence sustaining the averment in the bill that, not knowing the deed was of record, plaintiff asked to have it returned to him. There is also evidence that after the deed was recorded plaintiff demanded back a quitclaim deed which was refused, but we deem none of these features decisive.

Finally, plaintiff must be denied relief because of public policy—he does not come into a court of equity with clean hands. He is confronted with the related maxim that where the fault is mutual the law will leave the case as it finds it (*In pari delicto potior est conditio*, etc.).

There are exceptions to those maxims, but none of them avail this plaintiff. The maxim that he who comes into equity must come with clean hands is a cardinal one. It touches to the quick the dignity of a court of conscience itself. Hence, its application does not depend upon the averments of the pleadings, or the wish of counsel, but it may be invoked and applied,

*ex mero motu,* by the court. [16 Cyc. 148.] The case may well rest on this ground, if no other. [Poston v. Balch, 69 Mo. 115; McNear v. Williamson, 166 Mo. 358; Holliway v. Holliway, 77 Mo. 392; Hobbs v. Boatright, 195 Mo. 693.]

On this ground, too, defendant should be denied affirmative relief on the averments of her answer, even if those averments are sufficient to entitle her to such relief (on which question we do not pass).

The parties litigant made their bed—an unclean one—let them lie in it. Equity will not make it over. She is a handmaiden to Justice withal, but her precept is John Wesley's, "Cleanliness is indeed next to godliness."

There was evidence in the case on behalf of defendant that plaintiff was her tenant paying rent from time to time in wood, hay, etc. There was evidence to the contrary. The evidence on both sides on that behalf was put in on the issues of payment and delivery and not on any issue of the Statute of Limitations and title created by adverse possession, if any, since the execution of the deed.

We deem it proper to say that an issue of title by adverse possession since the execution of the deed is not involved in this suit and is, therefore, not passed on.

The judgment is reversed and the cause remanded with directions to dismiss plaintiff's bill, such dismissal to carry with it defendant's cross-bill in the form of an answer asking affirmative relief.

All concur; *Woodson, J.,* in all except what is said on the Statute of Limitations.