ANNIE SNITZER v. GERTRUDE POKRES and THEODORE POKRES, Appellants.—23 S. W. (2d) 155.

Division One, December 30, 1929.

*Seneca C. Taylor* for appellants.

388

*Edward K. Schwartz* for respondent.

ELLISON, C.—Claiming to be the owner of an undivided one-half interest in a lot at 3330 and 3334 Washington Avenue in St. Louis, the plaintiff brought this suit to cancel a quitclaim deed thereto, executed by her to the defendant Gertrude Pokres on December 4, 1924, and recorded in Book 4085, page 559, in the office of the Recorder of Deeds of said city. Her petition recites she executed the deed for the purpose of putting the record title in the name of

said defendant as a matter of convenience, with the understanding that the defendants would make a similar quitclaim deed back to her which she intended to withhold from record; but that after the conveyance first aforesaid the defendants wrongfully refused to reconvey to her except by deed reserving to them an option to purchase on certain terms and conditions, which option she was unwilling to give. Accordingly she prays the cancellation of her quitclaim deed, that the defendants be enjoined from collecting any rents upon said half interest in the premises, and for general relief.

The defendant Theodore Pokres, a real estate agent, is the husband of the defendant Gertrude Pokres. He was the promoter of the transactions which give rise to the controversy. The two defendants contend the defendant Gertrude Pokres owns the whole title to the lot and that the plaintiff has no interest therein except as equitable mortgagee. The lot was purchased in the first instance from C. E. Parker, who is the common source of title, and the deed was made to the plaintiff and one Lillie Birenbaum, sister of the defendant Theodore Pokres. That much is admitted. The plaintiff asserts the title was thus taken because she (and her husband) paid half the cash purchase money. The defendants say the money furnished by the plaintiff was advanced to them as a loan, and that her name was put in the deed as security therefor, and also to secure a certain additional commission or profit she was to receive. The defendants further maintain that when the plaintiff and her husband later executed to the defendant Gertrude Pokres the quitclaim deed in controversy it was in acknowledgment of the foregoing arrangement and that the quitclaim deed they tendered back and which the plaintiff refused to accept conformed to the actual rights of the parties.

The trial court found for plaintiff, cancelling the quitclaim deed. The defendants have appealed. Practically the sole question to be determined is one of fact—how much money the plaintiff and her husband contributed to the purchase of the lot, and whether she was to be half owner or merely loaned the money. Lillie Birenbaum, the other grantee in the deed from C. E. Parker, has quitclaimed to the appellant Gertrude Pokres and does not figure in the case except incidentally. It is conceded that the appellant Gertrude Pokres owns the other half interest in the lot, the part not claimed by the respondent.

There were only five witnesses. The respondent and Samuel Snitzer, her husband, testified on her side of the case, and the appellant Theodore Pokres and Messrs. Jones H. Parker and Oliver C. Vogel for the appellants. Mr. Parker is the brother of C. E. Parker who sold the lot, and represented her in the matter. Mr. Vogel, real estate officer of the Savings Trust Company of St. Louis, drew most

of the papers and took the acknowledgments. They testified mainly as to what was said by the parties when the sale was closed.

Samuel Snitzer and his wife, the respondent, operate a delicatessen shop in St. Louis. Theodore Pokres for some four years before the trial had been a real estate agent with offices in the Wainwright Building. Prior to that he was a plumber. All three were persons of German extraction. Mrs. Snitzer testified through an interpreter. The other two were not facile in expressing themselves in English. This makes it a little difficult to get a clear understanding of the facts, and the situation is further aggravated by the failure of both parties to offer in evidence and preserve in the record certain papers which would have aided in clearing up questions at issue.

The deed from C. E. Parker was dated April 23, 1923. The consideration therefor was $19,000, of which $12,000 was paid by a three-year six-per-cent note and first mortgage on the property signed by the two Snitzers and Lillie Birenbaum, and the balance of $7,000 in cash. The testimony for respondent was that she and her husband furnished half this cash as follows: a $500-check given by Samuel Snitzer to Theodore Pokres; $1399.10 in currency given by the respondent, Annie Snitzer, to Theodore Pokres; and a cashier's check for $1625 given by Samuel Snitzer to Theodore Pokres. All this together amounted to $3524.10.

The appellant Theodore Pokres testified he raised the entire $7,000 cash part of the consideration as follows: $2000 of his own money; $2500 borrowed from Samuel Snitzer; $1000 borrowed from his sister Lillie Birenbaum; and $1500 borrowed from the Savings Trust Company with Samuel Snitzer as signer on the note. His only obligation to the Snitzers growing out of the transaction, he says, was for this $2500 borrowed, and for $1000 profit or commission which he agreed to pay them out of the net rents from the property. We shall review the evidence touching these items more closely.

Samuel Snitzer testified that in March, 1923, the appellant Theodore Pokres suggested to him that he purchase the Parker property. They went to see it early one morning and Snitzer consented. The price was to be $18,500. Snitzer gave Pokres a check for $500 to be used for earnest money. The check was dated March 19, 1923, and was introduced in evidence. The indorsement and bank stamp are not shown in the record, but it appears from the testimony of Snitzer when the check was identified that it was indorsed by Pokres and cashed at the bank. On the evening of that same day Pokres came to Snitzer's delicatessen store and reported he had bought the property, but had had to pay $19,000 for it. He first stated he had purchased the lot for Snitzer's account and that his commission would be $300. Later in the conversation he said he would not

charge any commission and that they would both go in on the venture. Pokres didn't show Snitzer the earnest money contract he had made with the owner, and it was not put in evidence at the trial; but the fact seems to be undisputed that the contract was made to Pokres as vendee.

Pokres testified this $500 check had nothing to do with the Parker lot, but was given in connection with another transaction looking to the purchase of a property at Fountain and Bayard Avenues in St. Louis, which did not go through. He says he returned the money to Snitzer by another check. The respondent objected to that testimony on the ground that the refund check would be the best evidence. The objection was sustained, but appellants never did produce the check or account for their failure to do so. Snitzer denied he put up any money on the Fountain and Bayard Avenue project, and declared it was abandoned earlier in the year, besides. Pokres further stated the amount of earnest money he paid on the contract for the Parker lot was not $500, but $200, and in this was corroborated by Mr. Jones Parker; but we do not regard that fact as having much tendency to prove Snitzer did not give Pokres $500, as he says he did.

Relative to the $1399.10 item. The purchase of the lot was consummated at the banking house of the Savings Trust Company on April 23, 1923, as heretofore stated. The respondent, Annie Snitzer, testified that her husband went first to the bank that day and she came afterward. Either on the way to the bank or later on, she says, Pokres drove her to the Merchants Laclede Bank in his automobile and she drew out all of her account, amounting to $1399.10, and turned it over to him to be used in buying the property. No check or bank record was produced by respondent to corroborate her testimony on this issue, and Pokres denied it *in toto*—he denied receiving the money and denied that he drove her to the Merchants Laclede Bank.

Concerning the $1625, Samuel Snitzer swore that on the day the sale was closed he drew a check for $1625 payable to cash against his account in the Savings Trust Company and received for it a cashier's check in the same amount which he gave to Pokres. The counter check was offered in evidence, but the cashier's check was not. Pokres admitted Snitzer gave him a cashier's check, but declared he could not remember the amount of it. He swore that Snitzer had the cashier's check in his pocket while at the delicatessen store and that Snitzer handed him the check and enough money in currency to make $2500, which amount he, Pokres, borrowed.

Now, taking the appellants' version of how they raised the $7,000 cash purchase money. The appellant Theodore Pokres testified Samuel Snitzer had told him he wanted to find an investment that

would yield more interest than the bank was paying. Pokres says he suggested second mortgages, and then, later, when the possibility of buying the Parker lot arose, he proposed to Snitzer that if the latter would loan him $2500 for that purpose, he would give him $1000 commission or profit payable in eighteen months or two years out of half the net earnings of the property. The $2500 borrowed was to be paid within the same time. After some days' consideration Snitzer agreed and the money was advanced as recited in the preceding paragraph.

Pokres testified that in January, 1925, some twenty months after the purchase of the Parker lot, Samuel Snitzer requested him to pay back the $2500 so one of the Snitzer boys could be established in a drug store business. Pokres says that though this was some four months before the money was due, as an accommodation to the Snitzers he arranged to and did borrow the money at a bank with Samuel Snitzer as endorser, and had it ready to turn over when this lawsuit intervened. He declared that on January 28, 1925, at the time of executing the note, he and Mrs. Pokres delivered to Snitzer a "receipt" acknowledging their sole responsibility on the note. An unsigned copy of the receipt was introduced in evidence. Samuel Snitzer admitted on the stand signing a $2500 note for Pokres on one occasion as a "favor," and while he couldn't remember the date, we think it must have been the note mentioned by Pokres, as Snitzer said Pokres gave him a receipt about like the one Pokres introduced.

Going on to the other items, Pokres says he had $2000 of his own on deposit in one or both of two banks, the Savings Trust Company and the Grand Avenue Bank, and that he used that money in the transaction; but no records or cancelled checks of either bank were offered in evidence to prove it. He says he borrowed in addition $1000 from his sister, Lillie Birenbaum, but she did not testify and no writing evidencing the loan was introduced. He says he got the remaining $1500 of the required $7,000 by borrowing it from the Savings Trust Company on a note which Samuel Snitzer signed with him. This note, also, was not introduced in evidence, but it appears from the record that during the cross-examination of the appellant Theodore Pokres he produced the note, which was dated April 18, 1923, and due in thirty days, and also a check he gave to pay off the note on May 21, 1923. He testified he issued to Samuel Snitzer a receipt at the time of the execution of this note acknowledging his sole individual responsibility thereon. Neither the check nor the receipt were introduced in evidence. Being asked in what form he got the money on the note dated April 18 and what he did with it between then and April 23 when the purchase of the Parker lot was closed, he testified he thought he obtained a cashier's check

from the bank and held it for the intervening five days or else he got currency and kept it at home.

From his testimony it seems the arrangement whereby Theodore Pokres borrowed $1500 at the bank was temporary and that the plan was for Mrs. Snitzer and Mrs. Birenbaum, grantees in the deed from C. E. Parker (and apparently Samuel Snitzer, also), to refund the loan by executing a new note secured by a second deed of trust on the lot subject to the $12,000 first mortgage. There appears to be no controversy about the fact that the second deed of trust was executed less than a month later on May 10th for $1750 (covering also certain sale expenses) payable $50 a month. The deed of trust itself was not offered in evidence, but Theodore Pokres introduced a receipt he gave the Snitzers exempting them from liability on the second mortgage notes as follows:

"May 15th, 1923.

"I, Theodore Pokres, agent for property located at No. 3330-34 Washington Ave., hereby agrees to be responsible for the payments of the 2nd Deed of Trust which has been signed by Lillie Birenbaum and Annie Snitzer, wife of Samuel Snitzer, for the amount of ($1,750) One Thousand Seven Hundred and Fifty Dollars payable ($50) Fifty Dollars per month dated May 10th, 1923, with 6% interest until same will be paid.

"THEODORE POKRES."

In addition to the foregoing evidence specifically referring to the payments claimed to have been made in behalf of each party, there was some general testimony from Messrs. Jones H. Parker and Oliver C. Vogel tending to corroborate Pokres. Mr. Parker said that when the parties met at the bank on April 23rd to close their land transaction Mr. and Mrs. Snitzer and Mrs. Birenbaum were present. He says he particularly inquired why the deed from his sister C. E. Parker was being made to Mrs. Snitzer and Mrs. Birenbaum instead of to Mr. Pokres, as the earnest money contract provided, and that Pokres answered he was borrowing money from the grantees to make his cash payment on the property and was putting the title in their names to secure them. But this testimony at the trial was given in December, 1925, some two and a half years after the actual occurrence, and we are inclined to agree with the trial court that while the sincerity of the witnesses is not to be questioned in any degree, yet the accuracy of their recollection is open to doubt.

Speaking of Pokres, Mr. Parker said:

"I don't know how much money he had. I, of course, wasn't in on their deal. I didn't know anything about it—only what I found out from the matter in talking it over with Pokres and with those people. . . .

"I don't know anything about that. I saw them signing the papers; the papers were made out when I got there. They were all there. When I got there they were going out and they gave them to me to look over and when I looked over them and settled this matter in my own mind, whether I would take these papers from the purchaser in the place of Pokres—if they were the purchasers—I didn't know what they were, any further than they were talking about this money that they had to have and then they signed the papers and the notary fixed them up and I took the papers and went ahead and got my money, I guess—got my seven thousand dollars—I can't remember just the details, but, evidently I got the seven thousand dollars; otherwise I wouldn't have turned the deed over to them.

"Q. Mr. Pokres told you in the presence of Snitzer and his wife that he had borrowed twenty-five hundred dollars from them as part of the purchase price? A. Well, they were all talking about the amount of money. Of course, you know that class of people do a good deal of talking, you know, and they were talking about how they were going to determine—I think there was something said about a thousand dollars; that they was to get a thousand dollars for advancing this money.

"Q. That Snitzer was to get a thousand dollars for advancing the money? A. Snitzer; if that was the man—that was the old man that was to get a thousand dollars for advancing the money. There was some papers—

"Q. How much? A. I think it was thirty-five hundred dollars, as well as I remember, or twenty-five. It has been two and a half years ago.

"Q. It is your understanding then that Pokres explained to you in the presence of Snitzer he was borrowing twenty-five hundred dollars? A. Yes.

"Q. From Snitzer as part purchase price on the seven thousand dollars you were to receive? A. Yes.

"Q. What was said now about giving back this quitclaim deed? Do you remember anything about whether or not there was anything said about Snitzer was really going to own one-half of this property? A. No; he was advancing the money. He wasn't to own any part of it."

Mr. Parker states with some positiveness in other parts of his testimony that Mr. and Mrs. Snitzer were both present with the other parties at the meeting in the bank and that he heard Theodore Pokres say in their presence that they were to have $1000 profit for the use of the money they had advanced.

Mr. Vogel, also, testified the Snitzers were present at the bank when the deal for the Parker lot was closed, and that Mr. Pokres

said in their presence he was borrowing from them and Mrs. Birenbaum a part of the money to pay for the lot, and was taking the title in their name to secure them.

Mr. and Mrs. Snitzer swore they were not present together at the bank on the day the Parker lot sale was consummated. According to their testimony Mr. Snitzer went to the bank first while Mrs. Snitzer remained in the delicatessen store, and then after he came back she went to the bank. Both declared Pokres never at any time claimed he was merely borrowing the money they put up; but both said they understood Pokres was getting a half interest in the lot, the title to which part was being taken in the name of Lillie Birenbaum as grantee.

According to the view of the appellants the crowning piece of evidence showing the respondent Annie Snitzer took title to a half interest in the Parker lot only as security for money advanced, was this. Pokres said that at the time of the execution of the deed from C. E. Parker to Mrs. Snitzer and Mrs. Birenbaum, Mr. and Mrs. Snitzer signed and delivered to him, Pokres, a memorandum or receipt as follows:

"State of Missouri,      ss.    April 23, 1923.
"City of St. Louis,

"I, Annie Snitzer, wife of Samuel Snitzer undersign, hereby agrees and promise to return a clear deed to Gertrude Pokres, wife of Theodore Pokres, which has been given to me as an undivided one-half interest for property located at 3330-34 Washington Avenue as security of a loan of $2,500 & $1,000, profit for 18 months and not later than two years from above mentioned date in Lot 10 [here follows detailed description of lot.]"

Mr. Pokres asserted that when Mr. and Mrs. Snitzer later, in December, 1924, executed to Gertrude Pokres the quitclaim deed in controversy in this case, he surrendered to them the foregoing memorandum or receipt; and before the trial in the circuit court his counsel served a notice on the respondent to produce it. At the trial respondent's counsel declared, "There never was any such paper;" but it seems Mr. and Mrs. Snitzer were not interrogated by the lawyers on either side regarding the document. The court allowed appellants to introduce a carbon copy as secondary evidence.

The following evidence introduced by the respondent was regarded by the trial court as strongly tending to show the appellant Theodore Pokres and his wife did not claim to be the owners of the whole title to the Parker lot. On April 24, 1923, the day following the execution of the deed from C. E. Parker, Theodore Pokres rendered a statement to Mrs. Snitzer and Lillie Birenbaum charging them with $114.53 net expenses of the sale, including insurance

and rent adjustments, title examination, revenue stamps, recording and scrivener's fees. And for a period of sixteen months thereafter, between September, 1923, and December, 1924, he rendered monthly statements to Samuel Snitzer crediting Snitzer with half of the rent collected on the property less three per cent commission. One-half the monthly rent was $100 and the three per cent commission was $3, making the rental income to the Snitzers $97 per month. Pokres' checks for the amount due were inclosed with each statement, but from Snitzer's half of the net rent collected Pokres deducted one-half of the expenses accruing against the property. These included one-half of two semi-annual installments of interest on the $12,000 first mortgage, amounting to $360; one-half of $357.27 taxes, amounting to $178.64; one-half of $90 fire insurance and $27 for guttering and spouting on the building on the Parker lot; and some $60 for plumbing and a gas heater furnished to the Snitzers for the residence property in which they lived. Without going into the figures in further detail it is sufficient to say Pokres testified that the remittances thus made by him to the Snitzers out of the rents from the Parker lot during the period covered by the above monthly statements amounted to about $997 and left only $3 or $4 still due from him to pay the $1000 profit he had promised them (the Snitzers) out of the purchase of the Parker lot; and he said he gave them a check to pay up this balance of $3 or $4 before the execution of the two quitclaim deeds in dispute.

We shall refer now briefly, and finally, to the evidence concerning the making of the quitclaim deed attacked in this case. The respondent, Mrs. Snitzer, testified she was threatened with suit or had been sued by somebody for damages. She talked to the appellant Theodore Pokres about it and he told her she ought to make a quitclaim deed of the Parker lot to him or his wife to protect herself against the damage suit. Mr. and Mrs. Snitzer, one or both, at the time also owned two other pieces of real estate on Cates Avenue. Something was said about making a deed of these two properties also, "but it was finished up that the Cates Avenue property he said need not be transferred." It was in response to this suggestion from Pokres, Mrs. Snitzer testified, that she executed the quitclaim deed of the Parker lot in controversy in this case on December 4, 1924. Mr. Snitzer's testimony was substantially the same. He stated Pokres advised him to execute the quitclaim deed to the Parker lot and also one to the property on Cates Avenue, saying that when the party who was threatening the damage suit saw the real estate had been sold he would refrain from bringing suit. Snitzer's testimony differed from his wife's in this—that he said a deed conveying the property on Cates Avenue also was made, but to a different person.

When Mr. and Mrs. Snitzer executed the quitclaim deed to Gertrude Pokres under attack in this case, Mr. and Mrs. Pokres signed and acknowledged a quitclaim deed back to Mrs. Snitzer. Both deeds were introduced in evidence. Both were expressed to convey an undivided one-half interest in the lot, both were dated December 4, 1924, and acknowledged December 5, 1924, before Oliver C. Vogel, the witness heretofore mentioned. The deed from Mr. and Mrs. Pokres contained this reservation:

"This quitclaim deed is given to and accepted by said parties of the Second Part upon the condition that in the event they should want to dispose of the interest hereby conveyed to them, said party of the First Part or either of them shall have the option of repurchasing the interest hereby conveyed for the sum of $9500 plus interest at the rate of six per cent per annum from date of this instrument which option shall be exercised within 10 days after written notice has been served upon them of the grantee's intention to sell such interest."

There is some conflict in the testimony as to when the Pokres quitclaim deed was tendered back to the Snitzers. The latter both say it was nearly three months after they executed their quitclaim deed early in December, 1924 (which would fix the time as about March 1, 1925); and that in the meantime Pokres put them off repeatedly with excuses. Finally the Pokres deed was delivered and the Snitzers refused to accept it. Pokres said they would have to take it or nothing. About three weeks later, Snitzer testified, his wife brought this suit, and that estimate seems about right, as the suit was filed March 21, 1925.

Pokres' story is different. He swore he saw in the "Daily Record" where Mr. and Mrs. Snitzer had been sued for damages. He became alarmed, he said, knowing that the title to a half interest in the Parker lot stood in Mrs. Snitzer's name when it really belonged to him, so he went to them and asked them to quitclaim the property back to him. This, as will be remembered, was early in December, 1924, some four or five months before the expiration in April, 1925, of the two-year period within which he was to repay them the $2500 they had loaned him. He told them if they would execute the quitclaim deed to his wife he would secure his indebtedness to them by giving back the quitclaim deed containing the option clause last above quoted, whereby Mr. and Mrs. Pokres bound themselves to pay Mrs. Snitzer $9500 for her half interest in the property if she desired to sell. The amount, $9500, was arrived at in this manner: $6000 for a one-half part of the $12,000 first mortgage on the property which the Snitzers had signed; $1,000 to cover the profit promised them; and $2500 being the amount Pokres had borrowed from them.

I. The foregoing is a sufficient review of the facts. On the evidence we think the trial court was correct in deciding for the respondent, though the case is not free from difficulty. The Snitzers were evidently simple people. Mrs. Snitzer could not read or write English and her husband had only a limited knowledge of real estate transactions. We do not credit either of them with sufficient ingenuity to fabricate the story they told. Their statement that each in turn remained on duty at the delicatessen store while the other went to the bank to participate in closing the purchase of the Parker lot, impresses us as being true. So thought the trial court. They may be mistaken about not being at the bank at the same time. On the other hand, if both were present but not together, it is quite as possible that Mr. Parker and Mr. Vogel, testifying from memory two and a half years later, might have thought and believed the Snitzers both sat in the conference at once. In either event, the evidence does not shake our confidence in their sincerity.

Furthermore, the whole arrangement was extremely one-sided and indicates Theodore Pokres was the dominant figure in the transaction. The Snitzers signed $12,000 in first mortgage notes and became personally liable thereon. They signed $1750 in second mortgage notes and became similarly obligated. And yet Mr. Snitzer was not a necessary party to the $12,000-purchase-money mortgage and Mrs. Snitzer had only a half interest in the property and was tied up with a straw woman—for Lillie Birenbaum can hardly be thought to have been much more than that. The story of Pokres strains credulity. He said he was not seeking to avoid personal liability on these encumbrances, and that the execution of them by the Snitzers and Mrs. Birenbaum was purely incidental and grew out of the fact that he had borrowed money from them and wanted to put the title in their names as security, in consequence of which they had to sign the mortgages because they were the nominal holders of the title. Even if this were true of the mortgages, it was not true of the mortgage notes; and, besides, we can see no reason why Pokres might not have had the Parker deed made to himself or his wife and have deeded the property to Mrs. Snitzer and Mrs. Birenbaum *after* he and his wife had executed the mortgage papers —unless it was to effect a slight economy in the conveyancing.

In other respects Pokres' version of the transaction seems unnatural. If, as he says, his wife was equitable owner of the whole title to the Parker lot, and the record title was placed in the names of Mrs. Snitzer and Mrs. Birenbaum merely as security, it is hard to understand why Pokres would render a bill to them on the day following the sale charging them with the sale expenses, amounting to $114.53. And it is hard to understand why, for a period of sixteen

months thereafter, he remitted to Snitzer half the net rents, charging a three-per-cent commission; and charging them also with two semi-annual installments of interest on the first mortgage, amounting to $360; and with half the taxes, amounting to $178.64; and with half of the fire insurance premium on the property. He says he did this because the agreement was that he should pay the Snitzers their $1000 profit out of *one-half* the *net* rent and that he wanted the other half to take care of the $50 monthly installments payable on the $1750 second mortgage. These $50 installments were only a one-fourth of the total monthly rent, and we cannot see why he would arbitrarily reserve to himself a half of the rent. On the other hand if the Snitzers owned a half interest in the property, as they say, a payment of one-half the rent to them was natural, proper and necessary.

In their brief appellants point to the receipt which Pokres says the Snitzers gave him on April 23 when the Parker deed was executed, and say it conclusively shows Annie Snitzer accepted the deed from C. E. Parker as security for a loan of $2500 and $1,000 profit payable in eighteen months or two years—and not as half owner. The unsigned carbon copy of the instrument introduced in evidence and set out in an earlier paragraph of the opinion does so recite; but it will be remembered the respondent's counsel declared "there never was any such paper." The receipt was dated April 23, 1923, the same day that the Parker deed and the $12,000 first mortgage were executed. Both these latter instruments were drawn by Mr. Vogel, real estate officer of the Savings Trust Company, as scrivener. The crude language of the receipt clearly shows it was not prepared by any skilled hand. Why did appellants not have Mr. Vogel draft the receipt along with the other papers made that day?

Finally, there is another circumstance that to our minds is of great significance. The option reserved by Pokres in the quitclaim deed which he tendered back to the Snitzers called for the payment of $9500 for Mrs. Snitzer's half interest in the property. Pokres said he fixed the amount at $9500 by allowing $6,000 for a half part of the $12,000 first mortgage the Snitzers had signed, $2500 for the money they had loaned, and $1,000 for the profit promised them. This deed was dated December 4, 1924, and acknowledged the next day. But at that time, according to his testimony, he had already repaid them out of the net rents the entire $1,000 or practically so. It seems to us that this is a discrepancy that is unexplained and unexplainable. On the facts as a whole, we think the finding of the trial court was right.

II. Before taking up the other assignments of error it seems proper to refer to one question which the appellants have not raised. It is a cardinal maxim that he who comes into equity must come with clean hands. When a party makes a conveyance for the purpose of hindering or defrauding a creditor equity will ordinarily leave him where it finds him and deny relief. [Keener v. Williams, 307 Mo. 682, 707-8, 271 S. W. 489, 497.] The testimony for respondent was that the quitclaim deed attacked in this case was made by the Snitzers for the purpose of defeating somebody who had or was about to sue them for damages. That fact might in some circumstances justify the court in refusing to extricate them from their difficulty. And while the point has not been made by appellants the court can in a proper case raise it *ex mero motu*. [Creamer v. Bivert, 214 Mo. 473, 485-6, 113 S. W. 1118, 1122; Houtz v. Hellman, 228 Mo. 655, 671, 128 S. W. 1001, 1006.] But the rule has its exceptions and sometimes is not enforced, as when the parties were not *in pari delicto* and the defendant had an undue influence over the plaintiff, or where to deny relief would work a greater wrong. [Poston v. Balch, 69 Mo. 115, 121; McNear v. Williamson, 166 Mo. 358, 365, 66 S. W. 160, 161-2; Hobbs v. Boatright, 195 Mo. 693, 93 S. W. 934, 5 L. R. A. (N. S.) 906; 13 C. J. sec. 442, p. 498; 21 C. J. sec. 176, p. 189.] We think the appellant Theodore Pokres was the author of the fraud in this case, and in view of the Snitzers' limited capacity and the fact that the point had not been raised, are unwilling to turn the respondent out of court on that ground.

III. The trial court embodied written findings of fact in its decree. These findings were, in substance, that the respondent Annie Snitzer is the owner of an undivided one-half interest in the Parker lot; that the appellants are not the owners of said undivided one-half interest; that the quitclaim deed executed by the Snitzers is invalid and should be cancelled. The decree proper ordered and adjudged the cancellation of the deed; ordered an accounting of rents collected by Pokres on the Snitzer one-half interest between December 3, 1924, and the date of the decree, December 17, 1925; and enjoined the appellants from the further collection of rents on said half interest.

The answer of the appellant Gertrude Pokres among other things prayed the court to ascertain and determine the rights, titles and interests of the parties in the lot. Appellants complain that the decree is defective and violates Section 1970, Revised Statutes 1919, because it merely orders the cancellation of the Snitzer quitclaim deed, and fails to declare the interests of the parties, as prayed, especially the undisputed half interest belonging to Gertrude Pokres.

It is argued further that if the decree be construed as adjudging Annie Snitzer has a half interest in the land it is erroneous because it does not make the same subject to the $12,000 first mortgage and the $1750 second mortgage which Mrs. Snitzer admits she signed.

The decree is criticised in another respect. In the findings of fact it is recited that the respondent Annie Snitzer is the owner "of an undivided one-half interest in and to the following described property, located and situated in the city of St. Louis, State of Missouri: an undivided one-half interest in lot 10" etc. Appellants contend the repetition of the words "an undivided one-half interest" has the effect of making the decree reach only a quarter interest in the title—that is to say, an undivided one-half of an undivided one-half; and it is argued the remaining three-fourths interest is left unadjudicated. For all the foregoing reasons appellants assert the case must be reversed and remanded for a new trial.

We do not think this is so, at all. The only part of the title in dispute is an undivided one-half interest which is claimed by the respondent Annie Snitzer and adversely claimed by the appellant Gertrude Pokres. The meaning of the decree is plain though the words "an undivided one-half interest" are repeated. Neither does the failure of the decree to recite that the undivided one-half interest of Annie Snitzer is subject to the $12,000 first mortgage and the $1750 second mortgage in anywise invalidate it. The holders of these loans are not parties to the suit and of course cannot be affected by the judgment. However, all these objections can be met, and perhaps would be better met, by recasting the decree in these particulars.

Accordingly the cause is affirmed and remanded with directions to the trial court to modify its decree cancelling the quitclaim deed by further adjudging the respondent Annie Snitzer and the appellant Gertrude Pokres each to be the owner of an undivided one-half interest in the Parker lot (more fully described in the decree) both subject to the $12,000 first mortgage recorded in Book 3817, page 176, office of the Recorder of Deeds of the city of St. Louis, and to the $1750 second deed of trust if the same be yet outstanding. *Lindsay* and *Seddon, CC.*, concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.