### In Re: THE APPEARANCE OF A CERTAIN CHILD v. BOTOS
Case No. 80-4628-CA(D)03 "F"
Fifteenth Judicial Circuit, Palm Beach County
June 24, 1981

Richard E. Bosse, for adopting parents.

Joseph S. Karp, for objectioners.

JAMES T. CARLISLE, Acting Circuit Judge.

The petitioners seek to adopt a certain female child. The objectioners are the natural parents of the child. It will suffice to say that the record amply demonstrates the petitioners are competent, loving, adoptive parents, who, for the past year, have and will continue to provide a good home for the child. It is Manifest the best interest of the child lies with the petitioners.

### FINDINGS OF FACT

There are three factual issues presented in this case. The first arises from the natural mother/objectioner's contention that her consent to adoption was obtained by fraud or duress. The second is whether the natural father/objectioner's consent can be excused pursuant to Section 63.072(1) F.S. on the ground that he abandoned the child. The third is whether he subsequently evinced an interest in the child.

#### Whether the natural mother/objectioner's consent was obtained by fraud or duress.

The natural mother contends Dr. Wargo, her gynecologist, obtained her consent to the adoption through fraud and duress. She claims that she was pregnant, confused, and felt abandoned by her family, and that Dr. Wargo overcame her will through fraud and duress and convinced her to allow her child to be adopted. The mother gave birth to this child on June 3rd, 1980. She had been living with the natural father at his parents' home, and had relations with him there. She suspected that she was pregnant because of missed periods and because she felt kicking. Her suspiscions were confirmed when she went to Dr. Wargo in March of 1980.

During this time she lived in turn with her sister, her mother, and her father. Her mother had recently divorced her father and remarried. The natural father and his parents, her sister, her brother, and her father all knew of her condition. Only her mother was not told because, as she put it, her mother had been ill, suffering from a virus.

According to the mother/objectioner's testimony, when she went to Dr. Wargo in March, 1980, he advised her she could keep the baby or place it for adoption. He told her he would deliver the baby in a hospital, or she could go to an unwed mother's home, or have the baby through the Health Department. He told her that sometimes he knew of couples seeking to adopt children and oftentimes these couples would pay the medical expenses. He also told her that he would look to her for payment and that he usually expected to be paid in full by the seventh month. She was advised to think about the matter and advise Dr. Wargo when she reached the decision. She called several weeks later to ask that Dr. Wargo try to find a couple to adopt the child. She filled out the forms required by the Department of Health and Rehabilitative Services in the doctor's office. Docket entry 99. As she put it, the fraud and duress occurred because "he made me feel like I should put the baby up for adoption through his office, that it would be easier."

Mr. Botos met her at the hospital on June 5th, 1980. He testified she did not appear to be under the influence of any medication, she appeared somber but low key. He presented the consent form for her and told her that he needed her signature. He asked her to read the papers. He asked her if she understood their import. Her sister was present at the time. He left the room for approximately five minutes to let her think about it. When he returned he asked her if she understood and if she had any questions. Her only question was "Where do I sign?"

There is simply no evidence of fraud or duress. In fact, the record reflects quite the opposite. She was fully advised of her options by Dr. Wargo. She had the support and advice of her sister, her brother, and her father. She consulted with the natural father. She made an informed decision. That the decision was to take the path of least resistance in no way amounts to coercion, fraud, or duress.

The issue of the father/objectioner's abandonment.

The natural father knew that the girl was pregnant. They discussed the matter although "they did not discuss it that much." He had some plans about going in the Navy and wanted to delay getting married for thirteen years. However, he was finally persuaded to set a wedding date in January of 1981. They felt they were not ready for marriage yet. He testified he knew they could keep the child if they were married before

it was born. He said he did not want to get married while she was pregnant because it would then look as if they had been forced into it.

After her first visit in March, 1980, to Dr. Wargo, the natural mother advised him of the possibility that their medical expenses might be refunded if the child was adopted through Dr. Wargo's office. Knowing this, he wrote a check on April 3rd, 1980 for $350.00 payable to Dr. Wargo. He also permitted her to sign his name to a check dated May 8th, 1980, for $350.00 payable to Dr. Wargo. Not only was he aware of her plans for the baby's adoption, but he ratified them to the extent of $700.00. His testimony was that it was her decision and one he would not interfere with. The evidence at this point reflects that he was aware of the adoption proceedings, that he, in fact, consented to the proceedings, and was delighted to be relieved of an awkward situation.

In filling out the forms required by the Department of Health and Rehabilitative Services (Docket entry number 99), the natural mother furnished the father's birthday, religion, the fact that he had completed the tenth grade, and that he worked for the city of Boynton Beach, and a physical description. It would have been impossible to obtain his consent because means of identification were not afforded. It is fair inference she withheld this information because they decided to place the child for adoption and he did not want any responsibility for the child.

The evidence reflects that while the father was present at the hospital when the mother delivered the child, he was not at all concerned with the consequences of a child out of wedlock on the mother or the child. His only concern was with how it would look if they were married while she was pregnant. As he said concerning the adoption: "It didn't matter that much." The evidence is clear and convincing he deserted the child without affording means of identification and that he abandoned the child within the meaning of Section 63.072 F.S.

The third issue is whether the acknowledgement of paternity by the father and the filing of an objection to the adoption within ninety days provided by Section 63.122 F.S. requires his consent be obtained. This issue can be more accurately stated as whether he has truly ever evinced an interest in the child.

The issue of the father/objectioner's acknowledgement of paternity.

On August 7th, 1980, the father acknowledged in writing, pursuant to Section 63.062 F.S. a document admitting paternity of the child. On August 11th, 1980, he filed an objection to the adoption. In October the child's father and mother were married.

This sudden exhibition of parental concern began itself shortly after the mother's mother learned of the blessed event. Mrs. Mildred Mount, a social worker for the Department of Health and Rehabilitative Services, received a call on July 9th, 1980, from a man representing himself as "a friend of a grandmother who wants to adopt her grandchild." It was subsequently learned the man was the natural mother's stepfather. He advised Mrs. Mount that his wife did not know her daughter was pregnant and wanted her grandchild. One month later the father acknowledged paternity and on August 11th, 1980, filed his objection to the adoption.

His contention that the change occurred after he learned of his rights is inconsistent with his inability to explain his rights and responsibilities on cross examination. He was unable to explain the import of the acknowledgement of paternity even though the document was placed in front of him. The mother and the father each testified that they advanced the wedding date to October because "they were told it would look better" to the court. Their parents helped them buy a home so they could move from the boat on which they were living. It is a fair inference this move was made for appearances sake. It is apparent, and the court so finds, that the father abandoned the child. Any subsequent efforts to block the adoption or indicia of interest emanate in fact from the grandparents.

## SOME OTHER OBSERVATIONS

"Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sign, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson, or the itching overeagerness of the swift witness, as well as the honest fact of the truthful one, are alone seen by him. *Creamer v. Bivert*, 214 Mo. 473, 474 (1908).

While perhaps not borne out by the cold record, the natural parents in this case are as chaff blown by the wind. She is a high school graduate who worked as a cashier in a grocery store. He is a tenth grade drop-out who is a meter reader for the City of Boynton. To date they have not exhibited strength of character to rise above circumstances. They have gone through life scratching their carnal itches and reacting

to pressure by taking the path of least resistance. They were unwilling to take on the responsibilities of marriage and paternity. The latter they allowed someone else to assume. They were unable to withstand the pressure from her mother. Bowing to that pressure they now seek to rend this child from the adoptive parents, who cared for her and loved her for the past year.

## QUESTIONS OF LAW

"Abandonment consists of conduct which manifest a settled purpose to permanently forego all parental rights and the shirking of the responsibilities cast by law and nature so as to relinquish all parental claims to the child." *Solomon v. McLucas*, (2DCA 1980) 382 So 2d 339, at 344.

I am unaware of any case in which a court has been asked to determine the question of abandonment while the child was still in the womb. As was noted in *Solomon v. McLucas*, supra, at 345, the typical case involves a parent who places a child in the care of others and then fails to provide support. The Second District Court of Appeal noted that those facts standing alone were insufficient to constitute an abandonment. The Second District Court of Appeal stated that the case law requires evidence to show, in addition, that the natural parent failed to show any interest in the child, indicating a complete withdrawal from and neglect of parental duty and responsibility. The Second District Court of Appeal cited as an example of the evidence necessary to show abandonment, the case of *In re adoption of Lee*, 174 So 2d 87 (Fla 2DCA 1965). There the natural mother placed her child in a twenty-four hour nursery in Atlanta, Georgia. She did so because she was having an extremely difficult time financially, suffered poor health, a nervous collapse, and was hospitalized for one week. Despite all this, she visited the child four or five times in six months. She then moved to California and failed to contact the nursery when she arrived in California. The court noted she had led an extremely difficult life; she was married to a drunkard who squandered her savings, mortgaged her furniture, and continually harrassed her to the point of collapse. Eleven months later, upon learning of the adoption proceedings, she returned to Palm Beach County to oppose the adoption. The Second District Court of Appeal found she had abandoned her child.

In the instant case, the father took no interest in or responsibility for the child then developing in the mother's womb. They discussed the matter but, in his words, they did not discuss it that much because it just did not matter that much. He knew of the plan to place the child for adoption through Dr. Wargo's office and the possibility that the medical expenses could be refunded. He went along with it because "it

was her decision.'' He put a seal of approval on the plan to the extent of $700.00, knowing that the child would be adopted by strangers. He exhibited nothing but a set purpose to shed himself of this responsibility. Only after the July 9, 1980, telephone calls from the mother's step-father, indicating that the grandmother wanted to adopt the child, is the appearance of an interest in the child. That this interest was generated at the urging of the grandmother was apparent in his inability to explain the import of the acknowledgement of paternity even with the document before him. It is also apparent in the change of lifestyle, i.e. moving from a boat to a home, advancing the wedding date, once grandmother learned of her status as grandmother. It is therefore:

ORDERED that the petition for adoption is granted and the writ of habeas corpus discharged.