THEODORA RAINS, petitioner,

*v.*

ALEXANDER RAINS, defendant.

[Decided September 29th, 1939.]

*Mr. Frank J. Ortolano* (*Mr. Anthony P. La Porta,* of counsel), for the petitioner.

VAN WINKLE, A. M.

If the testimony offered by the petitioner in this uncontested divorce suit should have been accepted at its face value, the petitioner is entitled to a decree of divorce. Petitioner's testimony of what she said she had told her mother, and her mother's testimony covering this, was received under the rule laid down in *Haskell* v. *Haskell, 99 N. J. Eq. 399; 131 Atl. Rep. 876;* and if true, this testimony would have furnished some corroboration, as declared in that case.

My reason for dismissing the petition was that on my observation of the appearance of the petitioner and her mother and their manner of testifying, I found, as a fact, that their testimony relating to the essential things necessary to be proved before a decree of divorce should be advised was not true.

I received all the testimony that was offered. And I should say that the testimony itself, apart from my observation, was improbable. The parties were married September 22d, 1935. They lived in one room in the rooming house of petitioner's mother until April, 1939, all this time occupying the same bed. Petitioner testified that defendant refused to sexually cohabit with her "about six months" after the marriage until April, 1939, at which time she told him to leave, and he left. He had never paid any rent for the room, nor had he paid for the food. A fair inference was that he had been put out because of these defaults. Petitioner testified that she told her mother that defendant refused to sexually cohabit with her "right away," six months after the marriage; that she had told this to her mother "almost every day" thereafter, and that she went to a chiropractor "after about six months of the marriage," being "nervous," because of the defendant's refusal. The testimony of the petitioner and that of her mother matched. Usually, in cases of this kind, as I have found, where the ruling of the *Haskell* v. *Haskell, supra,* case is invoked, the parties have slept separately or in different rooms for all or a part of the two-year period specified in the petition for divorce as the desertion period.

In every suit for divorce there are at least three parties, the husband, the wife and the state. The suit is a triangular suit *sui generis*. At all times the state is represented by "the conscience of the court." A peculiar responsibility rests upon the court, particularly in uncontested cases. *1 Herr, Marriage, Divorce and Separation 137.*

Now that an appeal has been taken from the decree of dismissal, I dare say I should continue to represent the state on the presentation of the appeal to the extent of discussing how the appeal should be dealt with by our court of errors and appeals, for, under the present practice, on an appeal in an uncontested divorce suit only the counsel for the appellant appears with brief and argument, and to this extent the presentation of an appeal is one-sided.

Of course, courts and juries are not bound by mere swearing. Testimony, to be effective as a basis for a decree of divorce, must produce conviction in the mind of the judge in chancery who hears the case for the Chancellor, and who

sits with the united functions of judge and jury. How much weight is to be given to the testimony of a witness in a divorce suit, whether the suit be contested or uncontested, depends largely upon his appearance, his manner of testifying, and all the other evidence and circumstances from which the judge in chancery may credit or discredit him. It may be said, perhaps, that it is easier to come to a decision on these matters in contested cases when there is confrontation, and parties and witnesses are cross-examined by informed counsel, so that adverse testimony may be compared, for, if a judge may clearly find that a witness testifies truthfully, it necessarily follows that a witness who testifies contrarily is not testifying truthfully.

There is no presumption of law that an unimpeached witness has testified truly. *Wigmore (1st & 2d ed.)* § *2034.* Wigmore speaks of "the loose and futile but not uncommon fallacy that an unimpeached or uncontradicted witness must be believed." *4 Wigmore (2d ed.) 310* § *2034.* "The mere assertion of any witness does not of itself need to be believed, even if he is unimpeached in any manner, because to require such relief would be to give a quantitative and impersonal measure to testimony." *Wigmore (1st & 2d ed.)* § *2034.* "Absence of direct contradiction by the mouth of a witness does not make a fact undisputed in such a way as to require the court to find the same in an equity case, for the court is at liberty to discredit any witness." *1 Chamberlayne on Evidence* § *262;* and see *Riehl* v. *Riehl, 101 N. J. Eq. 15; 137 Atl. Rep. 787.*

In *State* v. *Tischler, 98 N. J. Law 580; 119 Atl. Rep. 372,* our court of errors and appeals, in speaking of the language of a trial judge in charging a jury, said: "The effect of this language seems plainly to make the logical and probable character of the story told by one or the other of the parties concerned the test of a verdict of guilt or innocence. But there are other considerations besides mere logic and probability which may legitimately influence the conclusion of a jury, notably, for example, the appearance and demeanor of the witnesses and the manner in which they may testify. The credibility of the witnesses and the verdict of the jury should

not be dependent exclusively on rules of logic and estimates of probability. The language used by the trial judge, in our estimation, constituted harmful error for which there must be a reversal."

"The conduct of the witness is formally offered in evidence, when it has occurred outside the court room. But it is no less admissible when it is exhibited in the court room and on the stand, even though no formal offer of it is then required. The demeanor of the witness on the stand may always be considered by the jury in their estimation of his credibility * * *. The witness' demeanor, then, is always assumed to be in evidence." *Wigmore (1st & 2d ed.)* § *946*. "The judge and the jury are enabled to obtain the elusive and incommunicable evidence of a witness' deportment while testifying." *Wigmore* § *1395*.

Multitudinous things are indicated by the word "demeanor," when the appearance of witnesses and their manner of testifying are referred to in the books. "And the courts have repeatedly declared that it is one of the most important functions of the trial judge, in determining the value and weight of the evidence, to consider the demeanor of the witness. They have called attention, as of the gravest importance, to such facts as the tone of voice in which a witness' statement is made, the hesitation or readiness with which his answers are given, the look of the witness, his carriage, his evidences of surprise, his gestures, his zeal, his bearing, his expression, his yawns, the use of his eyes, his furtive or meaning glances, or his shrugs, the pitch of his voice, his self-possession or embarrassment, his air of candor or seeming levity." *Jerome Frank, Law and the Modern Mind 1931.* Evidence of demeanor to the extent that it appears or is perceived in a trial court may be said, I think, to be "real" evidence in a very real sense.

When a judge in chancery functions at a hearing it is to be assumed that he does his duty, that is, that he observes the appearance of witnesses and their manner of testifying, in an endeavor to discover the truth; and that in so doing, that he uses his experience and every apprehending and perceiving faculty, with his judiciousness and his conscience

joined in the process.. And when he finds a witness to be honest or a liar, the matter is not made any clearer by calling what he has done "recognition," or "inspiration," as one prominent psychologist calls a similar process, or by calling what he has done "a hunch," as does an eminent judge. To label his finding of fact is not to tell what has taken place. In observing the demeanor of a witness and in coming to a conclusion on that demeanor a judge does not use any approved formulas; nor does he practice any art; nor does he proceed in any scientific way. So there is no terminology that he may employ to explain to an appellate court what has taken place. And, probably in most cases, he may not be able to satisfactorily declare, even to himself, the total process, to call it a process, that resulted in his being convinced. But in observing the appearance of witnesses and their manner of testifying, he has functioned as he should in properly coming to a conclusion concerning the true facts of the controversy before him for decision.

It is because of the demeanor circumstances that "can be manifest only to one who actually hears and sees the witnesses that upper courts have frequently stated that they are hesitant to overturn the decision of the trial judge in a case where the evidence has been based upon oral testimony; for the upper courts have recognized that they have before them only a stenographic or printed report of the testimony, and that such a black and white report cannot reproduce anything but the cold words of the witness. 'The tongue of the witness,' it has been said, 'is not the only organ for conveying testimony.' Yet, it is only the words that can be transmitted to the reviewing court, while the story that is told by the manner, by the tone, by the eyes, must be lost to all but him who observes the witness on the stand." *Jerome Frank, Law and the Modern Mind, 1931.*

An appellate court can hardly set aside a dismissal of a petition for divorce on the ground that the finding of a judge in chancery is "palpably against the evidence" when the dismissal is rested upon a finding of fact based on demeanor evidence, which finding has gone to the appellate court as a fact, as established evidence, but which evidence may not,

because of its nature, be examined in the appellate court. There is nothing in the appellate court as a logical or a legal base for its disestablishment. There is nothing whatever for the appellate court to lay its hands on. The demeanor evidence appeared in the trial court and it entirely disappeared there. It cannot be resurrected in any way in the appellate court. It is not communicable to the appellate court. I have called demeanor evidence "real" evidence, to emphasize what I am stating.

Vice-Chancellor Lane's conclusions in *Rhodes* v. *Rhodes, 92 N. J. Eq. 252; 114 Atl. Rep. 414,* were adopted *in toto* by our court of errors and appeals. Apparently, the demeanor facts reported by him in his conclusions in that case were decisive factors without which he would not have come to the decision he made. His method of reporting on his demeanor observations and his judgment thereon apparently were approved by our court of errors and appeals. But he only named or summarized what he saw and did. He reported, in part, in these words: "There are numerous circumstances, some of which are not apparent from the printed record, which have led me to take the story of the wife rather than that of the husband." In speaking of the wife and her witnesses he reported: "They impressed me favorably." In speaking of the husband, he reported that the husband had "testified hesitatingly." If there is a demeanor factor in the conclusions of a judge in chancery, which is a decisive factor, a thing vital to his conclusions, I think he should so inform our court of errors and appeals. Such report by him to witness the fact is due not only to himself, but to our court of errors and appeals and to the parties themselves. And I think a judge in chancery reports his finding on demeanor sufficiently if he only characterizes, if he uses only indicating words, if he states generally, if he reports, for instance, "I do not believe that the petitioner told the truth." What a judge has observed and done may seldom, if ever, be formulated into any systematic statement.

"In no other litigation is the personal presence of the parties in court more important, or the weight and value of their appearance and demeanor more vital, than in divorce pro-

ceedings * * *. The sufficiency of the evidence may depend to no inconsiderable extent upon the physical and mental strength of the parties, their condition of health, and other circumstances of that nature, of which little or nothing can be shown in the report of their testimony. Their tones of voice, their gestures, their meaning glances, their bearing towards each other, all of which are pertinent and often decisive factors in the mind of the court in passing upon the credibility and weight of their testimony, are wholly lost in the presentation of the case upon appeal. Hence the rule is peculiarly strong that the finding of the trial judge ought not to be disturbed unless it is palpably against the evidence * * * especially where the trial judge files an opinion in which he refers to the favorable or unfavorable demeanor of witnesses." *Moore on Facts* § *1279*.

"It may be said that the judge himself is a witness of what is occurring in his court room. He must determine what are the facts of the case from what he sees and hears, that is, from the words and gestures and other conduct of the witnesses." *Jerome Frank, Law and the Modern Mind 1931.* And as such witness the judge reports to the appellate court the fact concerning demeanor.

The following opinion in *Creamer* v. *Bevert, 214 Mo. 473,* included in the opinion in *Yutterman* v. *Sternberg (1937), 111 A. L. R. 741,* deals with demeanor and judgment thereon by an appellate court respecting the credibility of witnesses: "The bulk of the testimony was oral. In such condition of things, while this court has said over and over again that the whole record must come here in equity cases, so that (sitting as the final arbiter in chancery) we may weigh and decide *de novo* and thus do equity, yet the court is also fond of saying that deference should be given to the trial chancellor. He sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of

conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen fact of the liar, the glibness of the schooled witness in reciting a lesson, or the itching overeagerness of the swift witness, as well as the honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light, and yet not a soul who heard it, *nisi,* believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify. Therefore, where an issue in equity rests alone on the credibility of witnesses, the upper court may with entire propriety rest somewhat on the superior advantage of the lower court in determining a fact."

It may be said, I think, that the decisions of the courts of other states, respecting the Chancellor's decisions on facts, where no statutes are involved, are substantially in agreement. And, except for slight differences in words, they agree with the decisions of our own court of errors and appeals, as in *Guenther* v. *Guenther, 122 N. J. Eq. 77; 191 Atl. Rep. 840,* where it was held: "This is a fact case. The advisory master who saw the witnesses and observed their demeanor while testifying, concluded that the charges had been sustained. We have carefully examined the proofs and concur in the result reached." Take, for example, the comparatively recent decision in *Floberg* v. *Floberg* (*1935*), *358 Ill. 626,* by a unanimous court of seven judges: "This cause was tried by the Chancellor without a jury. He saw and heard the witnesses testify, observed their conduct and demeanor while testifying, and was in a position to, and did, pass upon the credibility of witnesses. In that situation we will not disturb his finding of facts."