208 So.2d 66

**John Thomas FAIRCLOTH, Jr.**

v.

**STATE.**

**1 Div. 244.**

Court of Appeals of Alabama.

Jan. 16, 1968.

Rehearing Denied Feb. 13, 1968.

Reynolds & Lauten, Mobile, for appellant.

MacDonald Gallion, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

Appellant was indicted by the 1966 Fall Session of the Grand Jury of Baldwin County, Alabama, for the offense of robbery. The indictment charged that he "feloniously took one Bulova Wrist Watch, of the value of $75.00, the property of Hubert Smith, from his person, and against his will, by violence to his person, or by putting him in such fear as unwillingly to part with the same, against the peace and dignity of the State of Alabama." Appellant, represented by counsel, entered a plea of not guilty, and upon trial in the Circuit Court of Baldwin County, he was found guilty by a jury and his punishment fixed at ten years imprisonment in the State Penitentiary. From said judgment and sentence, this appeal is made.

The State's first witness was Mr. Hubert Smith who stated that he was 43 years of age and a resident of Mobile, Alabama; that on August 11, 1966, at approximately

9:30 P.M. he and Mrs. Marjorie Kirkland were parked at the Club Oasis listening to a song on the radio; that appellant and Andrew J. Wiggins were parked behind him; that when he "reached behind and unlatched the door" appellant "snatched the door and laid a knife around my [his] neck"; that he (the witness) jerked the door open, saw the knife and twisted appellant's arm; that he asked appellant what he wanted and appellant replied, "Give me your cash"; that, while he was holding appellant's right hand which contained the knife, appellant took his (appellant's) left hand and tried to put it into his (the witnesses's) pocket and said, "Get out"; that he told appellant that he would not get out of the car; that the woman with him got out of the car to summon the police; and that Wiggins reached in the car and got his wrist watch and "jumped in the [Wiggins'] car and told this other one to come on and he pulled the car up side of the highway". The witness further testified that he was holding appellant's arm and that when he left he took the knife from him, after which the woman returned with the bouncer. He stated that the bouncer hit appellant on the forehead with a "slap jack" and helped him (the witness) hold the two men there until the deputy sheriff arrived. The witness testified that his watch was a self-winding Bulova, valued at $75.00.

The State's next witness, Mrs. Marjorie Kirkland, testified that she was parked with Hubert Smith on the night in question; that he had picked her up at 9:00 P.M. when she got off from work; that they drove to the Sportsman's Lounge where she had "one beer"; that they then drove to the Club Oasis where they stopped out front to hear a "piece playing on the radio"; that appellant and Wiggins walked up and appellant said, "Give me your cash" and "stuck his right hand in the car with a knife in it". The witness stated that appellant was trying to reach into Smith's pocket with his left hand while Smith held appellant's right hand which held the knife, and that Wiggins came over and jerked at

Smith's watch and broke the watch band and then "jumped in his car and left", returning later to ask appellant to leave with him. Mrs. Kirkland stated further that she went into the Club to call the police and when she returned Smith was outside the car; that when the deputy sheriff arrived Smith had given the knife to the bouncer; and that the knife was a large, white, switchblade knife with "little colored handles".

The State's next witness was Deputy Sheriff Roy Randall who testified that he answered a call to go to the Club Oasis on the night in question; that when he arrived appellant and Wiggins were there; that he "believed" it was Smith who gave the knife to him in the presence of the appellant and Wiggins; and that he brought the knife to the Court from the Baldwin County Jail where it had been kept since the night in question.

On cross-examination, Deputy Sheriff Randall stated that, in addition to Smith's and Wiggins' cars, he saw quite a few automobiles parked around the Club Oasis; that he talked with the waitress at the Club, whose name he did not remember; that she (the waitress) told him she knew nothing about the incident of the alleged robbery; that Wiggins and appellant had brought her to work; that she did not say anything about appellant and Wiggins causing any trouble inside the Club; and that she stated that if a "ruckus" took place, it was on the outside. Deputy Randall stated that when he arrived appellant was sitting on the ground and Wiggins was sitting beside him; that the bouncer did not tell him he had used a blackjack, nor did anyone else; and that no one turned a blackjack over to him. He stated that Exhibits Nos. 1 and 2, pictures of appellant with head and facial injuries, "looked like" appellant, but that he could not tell that night that appellant had been beaten in the head even though he was the one who brought appellant to the jail at Bay Minette; and that when he saw appellant he did not look like those pictures.

The Deputy further testified that he was not furnished with the watch in question; that he, Smith, Mrs. Kirkland and the man who ran the Club Oasis made a very thorough search of one hour for the watch with flashlights, looking on the ground, at the point to which the car was driven and on the median strip, but that he personally did not look in the automobile which Wiggins had gotten out of and did not know who did. He stated that he was by himself and had no other officers with him.

Appellant's first witness was Mr. Barnard Farley who testified to the good character of Wiggins but stated that he did not know appellant.

Appellant's second witness was Mrs. Judy Hudson who testified that she knew appellant and Wiggins, and that on the night in question they brought her to the Club Oasis where she worked as a waitress; that when they drove up to the Club there were other cars parked there; that she went into the Club to report for work and that appellant and Wiggins came in behind her and sat down; that she served them a pitcher of draft beer which they drank; that she normally worked the east side of the Club but that this night she worked the west side where the men were seated because they were short of help; and that while she was giving an order appellant came up and told her they were leaving and she thanked him for bringing her to work and he followed Wiggins out of the door. She stated that the next time she saw them the Sheriff had them in the "police car" and that Defendant's Exhibit No. 1 looked the way appellant looked at that time.

On cross-examination, the waitress stated that she had asked the manager if he would cash a check for appellant but was told that he could not. She also stated that the beer which the two men consumed was paid for by appellant with $1.50 though actually the cost of it was $2.50. She stated that she put a dollar with this money, since appellant had not let her pay for the gas for his car.

Appellant's next witness was Mrs. Jewel Maxine Childer who stated that she was under subpoena; that she was outside the Club Oasis when a "ruckus" occurred on the night in question; that she did not see what occurred but that the disturbance occurred shortly after she saw Wiggins come out of the Club and go toward his car; that there were "four or five" people involved; that there were more than three individuals involved other than the man who claims he was robbed and the woman he was with, though she could not identify them; and that she could not say whether appellant had come out of the Club at the time the trouble started. Mrs. Childer further stated that she saw Wiggins come from the door and go·over to his car and move it; and that during this time, the trouble started and she left while it was still going on. On cross, she stated that she saw Wiggins stop his car and come back toward the side door where the disturbance was. On re-direct, she stated that she did not recall seeing Wiggins go toward Smith's automobile before he went to his own car and that Wiggins was not in the "ruckus" at the time it started.

Appellant's next witness was the co-defendant, Andrew J. Wiggins. He stated that he and appellant took Mrs. Hudson from the Poinsettia Grill to the Club Oasis where she works as a waitress; that after they were seated there, Mrs. Hudson came over and waited on them; that they ordered a pitcher of beer and two mugs; and that appellant handed her $2.50 and she gave $1.00 back stating that since he would not let her pay for the gas she would put a dollar on the beer. Wiggins stated that they attempted to cash a check but Mrs. Hudson came back and told them that the boss did not accept personal checks; that they did not want anything else to drink as they had to work the next day; and that he (Wiggins) went out through the side door and pulled his car to where appellant would be coming out of the front door, so appellant would not have to wind around through the parked cars. Wiggins stated

that he stayed in the car for two or three minutes when he heard a commotion at the side door of the Club; that he got out of his car at which time a 1955 or 1956 Chevrolet with "tires spinning" left the Club; and that he went over and asked what the disturbance was and found appellant lying on the ground, unconscious with blood coming out of the side of his head. He testified that he asked the bouncer what had happened and Mr. Smith told the bouncer that appellant had stuck a knife at his throat and robbed him and that he (Wiggins) "was the one that got his watch and run". The witness stated that Mrs. Kirkland "started using foul language" and said that he had taken Mr. Smith's watch; that he told her he had not; and that the bouncer refused to let him give appellant a cigarette and told him to sit down beside him or he would give him the same treatment. Wiggins stated that the deputy sheriff came and put handcuffs on him and appellant; that Smith, Mrs. Kirkland and the deputy searched the ground for a watch and "somebody" searched his car, tearing the floorboard out, the back seat out, and cleaning out the glove compartment, and tearing the lining out of the headliner, but could not find a watch. They also searched appellant and Wiggins unsuccessfully.

Wiggins testified that the check, Defendant's Exhibit No. 3, was the one given him by appellant on the night in question; that he had cashed it for him before they got to the Oasis Club and that they had money with them; that appellant then bought four beers, played the record player and that they still had six or seven dollars left. He further stated that he did not take the watch and that neither he nor appellant had a knife. Wiggins stated that on the night in question he told the deputy that he did not know appellant and that he picked him up hitch-hiking, thinking the Deputy would let him go, but that this was not the truth.

Appellant testified in his own behalf and stated in substance the same as Wiggins concerning his activities until he left the Club Oasis but said that when he left (Wiggins had already gone outside), he saw three boys fighting with Mr. Smith and that he came over to give Smith a hand. Appellant attempted to refute all of Smith's testimony regarding snatching the car door open and having a knife, etc.; and stated that one of the three boys said "Let's go" and they left in a 1955 Chevrolet and Smith held him, evidently thinking he was one of the three boys. He stated that when the bouncer came out Smith, who was holding him, told the bouncer, "This is one of them that tried to rob me"; and when he turned around to explain the bouncer knocked him out with a blackjack.

On cross, appellant testified that he is now confined to Kilby Prison on four offenses of forgery; that he had received two years probation for extortion by use of U. S. Mail and two years for escaping in 1964—all of which were felonies and none of which was objected to. He stated that the pictures, Exhibits Nos. 1 and 2 were taken of him after the bouncer got through "working over" him; and that everything was hazy while he was on the ground.

The next three witnesses testified to the good character of appellant in the community in which he lives.

■ Appellant argues that the trial court committed reversible error by sustaining objection to testimony showing the circumstances regarding his former forgery convictions, relying on Hale v. State, 10 Ala. App. 22, 64 So. 530.

We do not feel that this was an analogous case. In Hale, supra, an impeached witness was permitted to testify that his conviction was more than 20 years before and when he was only 20 years of age. It was allowed in an effort to prove that he could have reformed since that time and

helped the jury in determining credibility. In the case at bar there is no similar testimony as the testimony sought to be introduced was in explanation of *why* he committed the forgeries. The sustaining of objection to such explanatory evidence is without error. In Nelson v. State, 35 Ala. App. 179, 44 So.2d 802, the court stated as follows:

"The court also correctly sustained the State's objections to questions propounded to the appellant by his counsel seeking to show explanatory details of the offense for which appellant was convicted by the court martial. Mayo v. State, 32 Ala.App. 264, 24 So.2d 769; Latikos v. State, 17 Ala.App. 655, 88 So. 47."

We have read the given charges as well as the Court's oral charge in the record and feel that the refused charges had been fully covered.

■ Appellant contends that the trial court was in error in sustaining the State's objection to the question, " * * * tell his honor and these gentlemen what their demeanor and manner was when they left the Club after they drank the beer you brought them." Appellant contends that here he was attempting to prove by their actions and demeanor that they had no intention of committing a theft, only of attempting to assist someone in trouble.

We feel that the court properly sustained this objection of the State, as it called for a conclusion of the witness and the questions were too general and vague. Webster's New Collegiate Dictionary defines the word "demeanor" as "outward bearing or behavior" and the case of Rains v. Rains, 17 N.J.Misc. 310, 8 A.2d 715, discloses more than fifteen different definitions for the word demeanor. Had appellant desired to prove a specific point or bring to the attention of the court a particular action, then more explicit questions were the proper means readily available, and this delving into generalities was properly disallowed by the trial court.

■ Appellant's contention that the trial court committed reversible error in sustaining objection to questions about whether or not Hubert Smith and Mrs. Kirkland had been to another club before they came to the Oasis has no merit. Appellant's counsel was allowed to question Smith about what and where he and Mrs. Kirkland had been drinking in the nature of intoxicating beverages on the night in question. We do not feel that the court abused its discretion in sustaining this objection. We quote from the record in part as follows:

"The Court: If you want to ask him if he was drinking, that is all right, but if you want to ask him what he and some woman were doing, that is another * * Go ahead and ask him.

"Q. Were you drinking?

"A. One beer.

"Q. Where did you have that beer?

"A. About a half mile or so before you get there.

"Q. What was the place a half mile or so before you get to the Oasis?

"A. Seafood place where they sell raw oysters; I don't know the name of the place.

* * * * * *

"Q. You had a beer?

"A. I had a beer.

"Q. Just one?

"A. Yes sir.

"Q. The usual one beer * * * Did she have a beer?

"A. Yes sir.

"Q. Did she have more than one?

"A. No sir.

"Q. Then it is your testimony that on this night at the time you say this ruckus occurred that you had only had

one beer and were not under the influence, is that right?

"A. That is right."

Thus, it appears from the record that the court did not prejudice the position of appellant and did allow him the opportunity to question the complainant regarding complainant's alleged drunkenness.

 Appellant argues that the court erred in refusing to allow appellant to cross-examine the alleged victim concerning what he was doing with a woman not his wife at the time of the alleged robbery. The court had previously said, "I'm not going to go into who this woman was—it has nothing to do with the case", and appellant's attorney replied, "The question of the man's integrity and veracity is at issue." Appellant contends that he was attempting to show whether or not Smith was robbed or was engaged in a fight because Mrs. Kirkland was possibly out with someone else's husband or because he was out with someone else's wife.

If appellant's counsel was attempting to show this, he should have established a proper predicate advising the court of such. Because of his failure to do so, the court did not err in refusing such testimony.

Appellant contends that three other people who could have committed the robbery drove off in a 1955 Chevrolet with the "tires spinning". Since there was a conflict of evidence concerning this contention, it became a question for the jury.

We have carefully studied all of appellant's claims of error and we find no error therein.

The evidence was sufficient to justify the verdict and we find no error in the record.

Therefore, the judgment in this cause is due to be and the same is hereby

Affirmed.